Mrs. Patricia B. MILLER, Individually, and on Behalf of her minor children, Denise Miller and Daniel Miller, Plaintiff,

v.

AMUSEMENT ENTERPRISES, INC., d/b/a Fun Fair Park, Defendant.

Civ. A. No. 3261.

United States District Court
E. D. Louisiana,
Baton Rouge Division.

Sept. 13, 1966.

Johnnie A. Jones, Baton Rouge, La., and Norman Amaker, New York City, for plaintiff.

W. P. Wray, Jr., Wray & Simmons, Baton Rouge, La., for defendant.

WEST, District Judge:

The plaintiffs bring this action pursuant to Section 201(b) (3) and Section 201(c) (3) of Title II of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000a(b) (3) and § 2000a(c), seeking to enjoin the defendant from denying Negroes access to its amusement park. The defendant, Amusement Enterprises, Inc., is a Louisiana corporation domiciled in Baton Rouge, Louisiana, doing business under the trade name "Fun Fair Park." Fun Fair Park is an amusement park owned and operated by the defendant. It is located in Baton Rouge, Louisiana, near the Airline Highway, a major highway connecting Baton Rouge and New Orleans, Louisiana. This amusement park covers approximately two and three-fourths acres of land, and defendant operates thereon a number of mechanical rides for the amusement of children. During the winter months defendant also operates an ice skating rink at Fun Fair Park. Most of the mechanical rides used by the defendant were manufactured in and purchased from sources located in states other than Louisiana, but ever since their acquisition by the defendant they have been permanently affixed to defendant's property in Baton Rouge, Louisiana. Thus, in the course of their use as items of amusement, they remain at one place in Louisiana and do not at any time after their purchase by defendant move in either interstate or intrastate commerce.

On March 1, 1965, plaintiff, Mrs. Patricia B. Miller, took her two children to Fun Fair Park, intending to use the ice skating facilities which were then in operation. Upon their arrival at Fun Fair Park, the attendant, believing that one of the children who requested a pair of skates was a white child, handed her a pair of skates. Thereafter, upon learning that both of the children were Negroes, the attendant retrieved the skates and informed the plaintiffs that the facilities of Fun Fair Park were privately owned and were open for use by white people only.

While there are concession stands operated by the defendant where refreshments are served on the premises of Fun Fair Park, plaintiffs are making no claim here that the defendant is operating those concessions in violation of either Sections 201(b) (2), 201(c) (2), 201(b) (4), or 201(c) (4) of the Civil Rights Act. Plaintiffs' sole contention in this suit is that the defendant is operating a "place of * * * entertainment" in violation of Section 201(b) (3) and Section 201(c) (3) of the Civil Rights Act of 1964.

After considering the applicable law, and the arguments and briefs of counsel, the Court is of the opinion that the defendant is not operating a "place of * * entertainment" in violation of Section 201(b) (3) or Section 201(c) (3) of the Civil Rights Act of 1964.

Section 201 of the Act provides, in pertinent part, as follows:

"SEC. 201. (a) All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin.

"(b) Each of the following establishments which serves the public is a place of public accommodation within the meaning of this title if its operations affect commerce, or if discrimination or segregation by it is supported by State action:

"(1) any inn, hotel, motel, or other establishment which provides lodging to transient guests, other than an establishment located within a building which contains not more than five rooms for rent or hire and which is actually occupied by the proprietor of such establishment as his residence;

"(2) any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food for consumption

on the premises, including, but not limited to, any such facility located on the premises of any retail establishment; or any gasoline station;

"(3) any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment; and

\* \* \* \* \* \*

"c) The operations of an establishment affect commerce within the meaning of this title if (1) it is one of the establishments described in paragraph (1) of subsection (b); (2) in the case of an establishment described in paragraph (2) of subsection (b), it serves or offers to serve interstate travelers or a substantial portion of the food which it serves, or gasoline or other products which it sells, has moved in commerce; (3) in the case of an establishment described in paragraph (3) of subsection (b), it customarily presents films, performances, athletic teams, exhibitions, or other sources of entertainment which move in commerce; \* \* \*"

Plaintiffs contend that Fun Fair Park is "a place of entertainment" as described in Section 201(b) (3), and that its operation "affects commerce" as defined in Section 201(c) (3) of the Act. Defendant, on the other hand, contends that first, Fun Fair Park is not a "place of entertainment" as contemplated by the Act, and secondly, that the operation of Fun Fair Park does not "affect commerce" as that term is specifically defined in Section 201(c) (3) of the Act. Since this is apparently a case of first impression, we must look to the Act itself and to the accepted rules of statutory construction in order to determine the extent of coverage of the various provisions contained therein.

To begin with, it is quite obvious that if the defendant's establishment is to be held to be covered by the Act, it must be determined that it is one of the facilities enumerated in Section 201(b) (3). That subsection covers "any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment." It is also equally obvious that the defendant's establishment is not a "motion picture house, theater, concert hall, sports arena, or stadium." Thus, it is quite evident that for Fun Fair Park to be held to be within the coverage of this Section of the Act, it must be held to be first, a "place of exhibition or entertainment" and secondly, it must be held to "affect commerce" within the purview of Section 201(c) (3). We will first consider whether or not it is a "place of exhibition or entertainment."

This inquiry is immediately narrowed to the question of whether or not it is a "place of entertainment" for the reason that, it being agreed by all parties to this suit that no exhibitions are presented or conducted on the defendant's premises, it is obviously not a "place of exhibition." So, our first inquiry is immediately limited to the question of whether or not Fun Fair Park is a "place of entertainment" as contemplated by Section 201(b) (3) of the Act.

■ Section 201(b) (3), before providing for coverage of places of entertainment, specifically enumerates the type of establishment that is to be covered by this Section. This enumeration includes "motion picture house, theater, concert hall, sports arena," and "stadium." All of these specifically enumerated establishments are the kind that furnish entertainment to spectators as distinguished from participants. After enumerating these specific establishments, Section 201(b) (3) then provides for inclusion of "other places of exhibition or entertainment." Again, the reference to "exhibition" denotes an exhibit for the entertainment of spectators and not participants. The use of the word "other" before the words "place of exhibition or entertainment" makes it clear that Congress intended that the establishments included under this group would be "other" establishments *similar* to those specifically enumerated in that Section. To so hold is merely to apply an old and accepted rule of statutory construction known as the ejusdem generis

rule. This rule is defined in Black's Law Dictionary, Fourth Edition, as meaning "of the same kind, class or nature." The Court, in Bumpus v. United States, 325 F.2d 264 (CA 10–1963), recognizing the validity of this rule, said:

"We are of the opinion that the case is peculiarly one for the application of the maxim *ejusdem generis*. Literally, that phrase means 'of the same kind or species.' It is a well known maxim of construction, sometimes called Lord Tenterden's Rule, to aid in ascertaining the meaning of a statute or other written instrument, and, under the maxim, where an enumeration of specific things is followed by a more general word or phrase, such general word or phrase is held to refer to things of the same kind, of things that fall within the classification of the specific terms."

And again, in Cuevas v. Sdrales, 344 F. 2d 1019 (CA 10–1965), the same Court said:

"Ordinarily, when specific terms in a statute are followed by general terms, the general terms are limited to matters similar to those specified, unless to do so would defeat the obvious purposes of the statute." (Citing authorities.)

Thus, since the establishments specifically enumerated in Section 201(b) (3) are all, without exception, of a kind which furnish entertainment to a spectator audience, rather than to a participating audience, it must follow that the general reference, following the specific, to "other place of * * * entertainment" must be held to refer to establishments of the same general kind as those specifically enumerated.

 If, as urged by plaintiff, Congress had intended "to open all places of public accommodation to Negroes" it would have been quite easy for it to have said so. If that was the intent of Congress, it is difficult to understand why it so painstakingly defined, in Section 201 (b), in four different categories, the specific accommodations it sought to deseg-

regate, and why it so carefully, in Section 201(c), provided for different tests to be applied in determining whether or not each of the several categories of public accommodations listed affects commerce. Obviously Congress did not intend to classify every business serving the public as a place of public accommodation. It is only those places falling within the definitions contained in Section 201(b) and Section 201(c) which Congress sought to reach by the Civil Rights Acts of 1964. Had they intended to include such activities as those engaged in at Fun Fair Park, it would have been simple for Congress to have included, for example, with "motion picture house, theater, concert hall, sports arena" and "stadium" in its list of specifics such other activities as bowling alleys, skating rinks, golf courses, amusement parks, and other participating activities. But it did not do so. And its failure to do so is a clear indication of its intention to exclude such activities from the coverage of the Act. Indeed, as stated in the Bureau of National Affairs Operations Manual on the Civil Rights Act of 1964 at page 83, "During the debates in the House, however, bowling alleys were mentioned specifically several times as examples of establishments outside the scope of the Act unless they operate lunch counters." Further indication that the type of activities engaged in at Fun Fair Park were not intended by Congress to be covered by the Act is found in the criticism of the Act by Honorable Robert W. Kastenmeier, who, while joining in the majority report of the House Judiciary Committee, criticized it for not going far enough in its coverage by stating:

"In title II, the bill reported by the full committee is deficient in that it guarantees equal access to only some public accommodations, as if racial equality were somehow divisible. Discrimination is prohibited in the reported version of H.R. 7152 in all hotels and lodging houses (with a minor exception), eating places, and places of entertainment and spectator sports. At the same time, the bill would allow

discrimination to continue in barber shops, beauty parlors, many other service establishments, retail stores, bowling alleys, and other places of recreation and participation sports, unless such places serve food. It is hard to follow a morality which allows one bowling alley to remain segregated, while another bowling alley down the street which serves sandwiches must allow Negroes to bowl." 2 U.S. Cong. and Adm. News (1964), p. 2410.

But despite this criticism by Mr. Kastenmeier, during the House debates, no change was made in this provision of the Act. Thus the intention of Congress seems clear. In commenting on Section 201 in its section by section analysis of the Act, the Senate Report (Judiciary Committee) No. 872, stated:

"There is no change from the bill as introduced. This is the second of three mutually exclusive groups of public establishments that are covered by the bill. This subsection would include all public places of amusement or entertainment which customarily present motion pictures, performing groups, athletic teams, exhibitions, or other sources of entertainment which move in interstate commerce. These public establishments would be within the purview of the bill even though at any particular time the source of entertainment being provided had not moved in interstate commerce. It is sufficient if the establishment "customarily" presents entertainment that has moved in interstate commerce. If this test is met, then the establishment would be subject to the bill at all times, even if current entertainment had not moved in interstate commerce." 2 U.S. Cong. and Adm. News (1964), p. 2357.

Thus, it is again apparent that there was a specific intent on the part of Congress to include in this Section only those establishments presenting entertainment for spectators rather than for participants. To hold otherwise would be to add something to the Act which Congress obviously intentionally omitted.

But even if we were to conclude that such a place of entertainment as that operated by the defendant could be held to be a place of public accommodation under Section 201(b) (3) of the Act, it still could not be held to "affect commerce" as that term is defined in Section 201(c) (3). That Section sets forth specific requirements which each of the mutually exclusive groups of establishments listed in Section 201(b) must meet if the establishment is to be covered by the Act. It is important to note that Congress carefully provided, in Section 201(c), for different criteria to be applied to each of the different groups of establishments listed in Section 201(b) when determining whether or not the establishment in question "affects commerce" such as to be considered an establishment covered by the Act. For example, Section 201(c) (1) provides that if the establishment in question is an inn, hotel, motel, etc. specifically listed in Section 201(b) (1), it is automatically covered by the Act. But when, in Section 201(c) (2) it dealt with restaurants, cafeterias, lunch rooms, etc., it used a different criteria. As to these establishments it is necessary to find that the establishment serves, or offers to serve interstate travelers or that a substantial portion of the food served *has moved* in interstate commerce. Then, when they came to the group of establishments including motion picture houses, theaters, concert halls, sports arenas, stadiums, and other places of exhibition and entertainment, an entirely different test was prescribed. Section 201(c) (3) provides that for such an establishment to affect commerce, it is necessary to find that it *customarily presents* films, performances, athletic teams, exhibitions, or other sources of entertainment *which move* in commerce. Again, applying the rule of ejusdem generis, it is obvious that the "other sources of entertainment" referred to includes only such things as are similar to the ones specifically enumerated, i. e., films, performances, athletic teams, and exhibitions, all of which are for the entertainment of spectators and not participants.

But of even more significance is Congress' choice of words in referring to movement in commerce. When it laid down the test to be applied to restaurants and other eating places, it specifically provided that if a substantial portion of its food *has moved* in commerce, the establishment is covered. But when dealing with places of entertainment, it used a different test. The test here is whether or not the source of entertainment, such as the films, performances, exhibitions, etc. *move* in commerce. There is obviously a vast difference between that which *has moved* in commerce and that which *moves* in commerce. If a restaurant purchases its food in one state and has it shipped into another state, that food has moved in interstate commerce. But if the operator of Fun Fair Park purchases a mechanical device in a state other than Louisiana and has it shipped to Louisiana where it is then set up and operated permanently at one location as a source of entertainment, that device is not a "source of entertainment *which moves* in interstate commerce." The device is certainly not a source of entertainment until it is set up and operated. While the device itself, before it becomes a "source of entertainment" *might have moved* in commerce, nevertheless, if, as in the present case, after it has been set up and made operative in a permanent location as a source of entertainment it no longer *moves* in interstate commerce, then, by the express language of Section 201(c) (3), it does not "affect commerce." In the present case there is no dispute about the fact that subsequent to their initial purchase by defendant, the mechanical rides operated at Fun Fair Park move nowhere, either in interstate or intrastate commerce. It simply cannot be said that defendant is operating an establishment which "customarily presents * * * sources of entertainment which move in commerce." Thus, even if it were found that Fun Fair Park is a place of entertainment as contemplated by Section 201(b) (3), it must nevertheless be concluded that the sources of entertainment utilized at the Park do not *move in commerce* as contemplated by Section 201(c) (3).

Plaintiffs filed a motion for summary judgment, but at the pre-trial conference held on April 18, 1966, it was agreed by counsel for both parties that this case would be submitted to the Court on the stipulated facts herein set forth, and that the motion for summary judgment would be carried with the case. Now, for the reasons herein set forth, it is concluded that the defendant is not operating its facilities at Fun Fair Park in violation of Section 201(b) (3), or 201 (c) (3) of the Civil Rights Act of 1964, and thus, plaintiffs' motion for summary judgment must be denied and, on the merits this suit must be dismissed at plaintiffs' cost. Judgment will be rendered accordingly.