Rosalyn KYLES and Doris Daniel, Plaintiffs,

v.

Euell PAUL, Jr., Individually and as Owner, Manager or Operator of the Lake Nixon Club, Defendant.

Rosalyn KYLES and Doris Daniel, Plaintiffs,

v.

J. A. CULBERSON, Individually and as Owner, Manager or Operator of Spring Lake, Inc., Defendant.

Nos. LR–66–C–149, LR–66–C–150.

United States District Court
E. D. Arkansas, W. D.

Feb. 1, 1967.

**414**

John W. Walker, Little Rock, Ark., for plaintiffs.

Sam Robinson, Little Rock, Ark., for defendant Euell Paul, Jr.

Phillip Carroll, Little Rock, Ark., for defendant Culberson and Spring Lake, Inc.

*Memorandum Opinion*

HENLEY, Chief Judge.

These two suits in equity, brought under the provisions of Title II of the Civil Rights Act of 1964, P.L. 88–352, § 201 et seq., 78 Stat. 243 et seq., 42 U.S.C.A. §§ 2000a and 2000a–1 through 2000a–6, have been consolidated for trial and have been tried to the Court without a jury. Federal jurisdiction is not questioned and is established adequately by reference to section 207 of the Act, 42 U.S.C.A. § 2000a–6.

Plaintiffs are Negro citizens of Little Rock, Pulaski County, Arkansas. The defendants in No. 149, Mr. and Mrs. Euell Paul, Jr., own and operate a recreational facility known as Lake Nixon. The corporate defendant in No. 150, Spring Lake Club, Inc., owns and operates a similar facility known as Spring Lake. All of the stock in Spring Lake Club, Inc., except one qualifying share, is owned by the defendant, J. A. Culberson, and his wife.

The two establishments are not far from each other. Both are located in Pulaski County some miles west of the City of Little Rock. In July 1966 the two plaintiffs presented themselves at both establishments and sought admission thereto. They were turned away in both instances on the representation that the establishments were "private clubs."

On July 19 plaintiffs commenced these actions on behalf of themselves and others similarly situated. The complaints allege in substance that both Lake Nixon and Spring Lake are "Public Accommodations" within the meaning of Title II of the Act, and that under the provisions of section 201(a) they, and others similarly situated, are "entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations [of the facilities] without discrimination or segregation on the ground of race, color, religion, or national origin." They pray for appropriate injunctive relief as provided by section 204 of the Act.

In their answers the defendants [1] deny that Lake Nixon and Spring Lake are public accommodations within the meaning of the Act; affirmatively, they plead that the two facilities are "private clubs" and are exempt from the Act by virtue of section 201(e), even if initial coverage exists.

Sections 201(a) and 201(b) of the Act prohibit racial discrimination in certain types of public accommodations if their operations "affect" interstate commerce, or if racial discrimination or segregation in their operation is "supported by State action."

Section 201(b) makes the prohibition applicable to four categories of business establishments, namely:

"(1) any inn, hotel, motel, or other establishment which provides lodging to transient guests, other than an establishment located within a building

---

1. Originally, the suits were brought against Mr. Paul and Mr. Culberson only. At the commencement of the trial Mrs. Paul and Spring Lake Club, Inc. were made parties defendant without objection and they have adopted, respectively, the answers of Mr. Paul and Mr. Culberson.

which contains not more than five rooms for rent or hire and which is actually occupied by the proprietor of such establishment as his residence;

"(2) any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food for consumption on the premises, including, but not limited to, any such facility located on the premises of any retail establishment; or any gasoline station;

"(3) any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment; and

"(4) any establishment (A) (i) which is physically located within the premises of any establishment otherwise covered by this subsection, or (ii) within the premises of which is physically located any such covered establishment, and (B) which holds itself out as serving patrons of such covered establishment."

Section 201(c) sets forth criteria whereby it may be determined whether an establishment affects interstate commerce. That section is as follows:

"The operations of an establishment affect commerce within the meaning of this subchapter if (1) it is one of the establishments described in paragraph (1) of subsection (b) of this section; (2) in the case of an establishment described in paragraph (2) of subsection (b) of this section, it serves or offers to serve interstate travelers or a substantial portion of the food which it serves, or gasoline or other products which it sells, has moved in commerce; (3) in the case of an establishment described in paragraph (3) of subsection (b) of this section, it customarily presents films, performances, athletic teams, exhibitions, or other sources of entertainment which move in commerce; and (4) in the case of an establishment described in paragraph (4) of subsection (b) of this section, it is physically located within the premises of, or there is physically located within its premises, an establishment the operations of which affect commerce within the meaning of this subsection. For purposes of this section, 'commerce' means travel, trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia and any State, or between any foreign country or any territory or possession and any State or the District of Columbia, or between points in the same State but through any other State or the District of Columbia or a foreign country."

Section 201(d) is as follows:

"Discrimination or segregation by an establishment is supported by State action within the meaning of this subchapter if such discrimination or segregation (1) is carried on under color of any law, statute, ordinance, or regulation; or (2) is carried on under color of any custom or usage required or enforced by officials of the State or political subdivision thereof; or (3) is required by action of the State or political subdivision thereof."

The exemption invoked by defendants appears in section 201(e) which provides that the provisions of Title II of the Act do not apply to "a private club or other establishment not in fact open to the public, except to the extent that the facilities of such establishment are made available to the customers or patrons of an establishment within the scope of subsection (b) of this section."

Federal prohibitions of racial, ethnic or religious discrimination or segregation in State and municipal facilities are based ultimately on the 14th Amendment to the Constitution of the United States. Title II of the Civil Rights Act of 1964 finds its constitutional sanction in the commerce clause of the Constitution itself. Constitution, Article 1, Section 8, Clause 3. That Title II, as written, is constitutional is now settled beyond question, at least as far as this Court is concerned at this time. Heart of Atlanta Motel v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258; Katzenbach v. McClung, 379 U.S. 294, 85

S.Ct. 377, 13 L.Ed.2d 290; Willis v. The Pickrick Restaurant, N.D.Ga., 231 F.Supp. 396, appeal dismissed Maddox v. Willis, 382 U.S. 18, 86 S.Ct. 72, 15 L.Ed. 2d 13, rehearing denied, 382 U.S. 922, 86 S.Ct. 286, 15 L.Ed.2d 237.

■ The rationale of those holdings is that Congress permissibly found that racial discrimination, including racial segregation, in certain types of business establishments adversely affects interstate commerce, and acted constitutionally to prohibit such discrimination. Those cases also establish that, even though practices on the part of an individual enterprise have no significant or even measurable impact on commerce, such practices by such enterprise are prohibited where they are of a type which Congress has found affects commerce adversely.

In coming to the latter conclusion the Court in McClung drew an analogy between an individual business man who practices racial discrimination and an individual farmer who violates a provision of the Government farm program. It was said (pp. 300–301 of 379 U.S., p. 382 of 85 S.Ct.):

> "It goes without saying that, viewed in isolation, the volume of food purchased by Ollie's Barbecue from sources supplied from out of state was insignificant when compared with the total foodstuffs moving in commerce. But, as our late Brother Jackson said for the Court in Wickard v. Filburn, 317 U.S. 111, [63 S.Ct. 82, 87 L.Ed. 122] (1942):
>
> " 'That appellee's own contribution to the demand for wheat may be trivial by itself is not enough to remove him from the scope of federal regulation where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial. * * * ' "

■ The burden in these cases is upon the plaintiffs to establish, first, that the facilities in question are establishments covered by the Act and, second, that plaintiffs have been subjected to racial discrimination prohibited by the Act. On the other hand, the burden is upon the respective defendants to show that they are entitled to the private club exemption which they invoke.

There is no serious dispute as to the facts in either case.

Lake Nixon has been a place of amusement in Pulaski County for many years. Several years ago the properties were acquired and improved by Mr. and Mrs. Paul, the present owners and operators. The Spring Lake property was acquired by Mr. Culberson in the spring of 1965 and the Spring Lake Club, Inc. was organized as an ordinary business corporation under the general corporation laws of Arkansas on April 22 of that year.[2] Both establishments are operated for the financial profit of the owners or owner. During 1965 and 1966 Lake Nixon earned substantial profits; Mr. Culberson is not sure whether Spring Lake has earned profits; no dividends have been paid by the corporation, and Mr. Culberson has drawn no salary. He is engaged in a number of business enterprises, and Spring Lake is actually operated by hired employees of the corporation.

The facilities available at both establishments are essentially the same although those at Lake Nixon are considerably more extensive than those available at Spring Lake. Primarily, the recreation offered is of the outdoor type, such as swimming, boating, picnicking, and sun bathing. Lake Nixon also has a miniature golf course.

There is a snack bar at each establishment at which hamburgers, hot dogs, some sandwiches, soft drinks, and milk were sold to patrons during 1965 and 1966. However, the snack bar operations

2. Mr. Culberson did not recall definitely whether title to the property was taken originally in his name and then transferred to the corporation or whether the former owner conveyed directly to the corporation. The matter is not material. Mr. Culberson's primary purpose in incorporating his operation was to avoid personal tort liability in case of accidental injury to a patron.

were purely incidental to the recreational facilities, and the income derived from the sales of food and drinks was small in comparison to the income derived from fees for the use of the recreational facilities. About the middle of August 1966 and after this suit was filed, the sale of food items at Spring Lake was discontinued entirely.

In each of the snack bars there is located a mechanical record player, commonly called a "Juke Box," which patrons operate by the insertion of coins. Patrons may dance to the juke box music or may simply sit and listen to it. There is no dispute that the juke boxes were manufactured outside of Arkansas, and the same thing may be said about at least many of the records played on the machines. The machines are rented from their local owner or owners by both of the establishments here involved.

During the months in which Lake Nixon is open, a dance is held once a week on Friday or Saturday night. An attendance charge is made with respect to those dances, and there is "live music" supplied by local bands made up of young people who call themselves by such names as "The Romans," "The Pacers," or "The Gents." Although the bands are compensated for their playing, actually the musicians are little more than amateurs, and their operations do not in general extend beyond the Little Rock-North Little Rock area; certainly, there is nothing to indicate that these young musicians move in interstate commerce.

On occasions similar dances are held at Spring Lake, but they are sporadic and care is taken not to schedule a dance at Spring Lake for the same night on which a dance is to be held at Lake Nixon.

The operators of both facilities have stated candidly that they do not want to serve Negro patrons for fear of loss of business, and they do not desire to be covered by the Act. In this connection it appears that Mr. Culberson is willing to do just about anything in the future to avoid coverage if Spring Lake is in fact covered and non-exempt at this time.

Following the passage of the Act, Mr. and Mrs. Paul began to refer to their operation as a private club, and patrons have been required, at least during 1965 and 1966, to purchase "memberships" for the nominal fee of twenty-five cents a year or per season. Those fees are in addition to regular admission charges. A similar procedure has been following at Spring Lake which was not organized until after the passage of the Act. At Lake Nixon "memberships" to the "club" are sold by either Mr. or Mrs. Paul; at Spring Lake "memberships" are sold by whatever employee or employees happen to be in charge of the operation at the time.

The Court finds that neither facility has any membership committee; there is no limit on the number of members of either "club," [3] no real selectivity is practiced in the selection of members, although at each establishment the management reserves the right to refuse to admit undesirables; there are no membership lists. The Pauls do not know how many people are "members" of the Lake Nixon Club; Mr. Culberson estimates that Spring Lake, the smaller of the operations, has about 4,000 "members." Subject to a few more or less accidental exceptions at Spring Lake, Negroes are not admitted to "membership" in either "club." White applicants for membership are admitted as a matter of routine unless there is a personal objection to an individual white person making use of the facilities.

The record reflects that during 1965 and 1966 Lake Nixon has used the facilities of Radio Station KALO to advertise its weekly dances; the announcements were made on Wednesdays, Thursdays, and Fridays of each week from the last of May through September 7. During the

---

3. When plaintiffs applied for admission to Lake Nixon and asked about joining the "club," they were told that the membership was full; the Pauls now admit that such statement was false in that there has never been and is not now any limit to the "membership" of the "club."

same period Lake Nixon inserted one advertisement in "Little Rock Today," a monthly magazine indicating available attractions in the Little Rock area, and also inserted one advertisement in the "Little Rock Air Force Base," a monthly newspaper published at the Little Rock Air Force Base at Jacksonville, Arkansas.

On June 4, and June 30, 1966, Spring Lake advertised Saturday night dances over Radio Station KALO; on May 26, 27, and 28 a dance was advertised over Station KAAY. Station KMYO apparently leased the premises for a picnic held in July and advertised that picnic from June 6 through July 16.

In 1965 Spring Lake advertised certain dances by means of announcements over Station KALO. Two of those announcements indicated that there would be diving exhibitions during the intermissions, and one of the announcements was to the effect that in addition to the diving exhibition there would be a display of fireworks.

The record contains a sample of a brochure put out by Spring Lake; that brochure shows pictures of the facilities, describes them in some detail, refers without emphasis to "guest fees" in addition to the regular admission charge and points out that the fee of twenty-five cents is to be paid only once. Readers of the brochure are advised that the facilities may be reserved for private parties by telephoning "well in advance." The brochure also contains a map showing one how to reach Spring Lake, and the "membership cards" of Spring Lake depict a similar map.

As stated, both establishments are located some miles west of Little Rock. Both are accessible by country roads; neither is located on or near a State or federal highway. There is no evidence that either facility has ever tried to attract interstate travelers as such, and the location of the facilities is such that it would be in the highest degree unlikely that an interstate traveler would break his trip for the purpose of utilizing either establishment. Of course, it is probably true that some out-of-State people spending time in or around Little Rock have utilized one or both facilities.

Food and soft drinks are purchased locally by both establishments. The record before the Court does not disclose where or how the local suppliers obtained the products which they sold to the establishments. The meat products sold by defendants may or may not have come from animals raised, slaughtered, and processed in Arkansas. The bread used by defendants was baked and packaged locally, but judicial notice may be taken of the fact that the principal ingredients going into the bread were produced and processed in other States. The soft drinks were bottled locally, but certain ingredients were probably obtained by the bottlers from out-of-State sources.

Turning now to the law, the Court will take up the issues in what appears to it to be a convenient, if perhaps not a strictly logical, order.

■ Defendants' claims of exemption as private clubs will be rejected out of hand. The Court finds it unnecessary to attempt to define the term "private club," as that term is used in section 201(e) because the Court is convinced that neither Lake Nixon nor Spring Lake would come within the terms of any rational definition of a private club which might be formulated in the context of an exemption from the coverage of the Act. Both of these establishments are simply privately owned accommodations operated for profit and open in general to all of the public who are members of the white race. Cf. United States v. Northwest Louisiana Restaurant Club, W.D.La., 256 F.Supp. 151.

■ The Court finds without difficulty that plaintiffs were excluded from both facilities because they are Negroes. That fact was expressly admitted by Mr. Paul speaking for Lake Nixon and is inferable if not substantially admitted with respect to Spring Lake. The Court finds also that any other individual Negroes who might have applied for admission to the facilities during 1966 would have been excluded on account of their race, and that defendants will continue to exclude Ne-

groes unless the Court determines that the facilities are covered by the Act.

This brings the Court to a consideration of the basic issue of coverage. The question is not whether Lake Nixon and Spring Lake are "public accommodations," but whether they are public accommodations falling within one or more of the four categories of establishments covered by the Act.

■ It is not suggested that either establishment falls within the first statutory category, and the Court is persuaded that neither falls within the fourth. In that connection the Court finds that both Lake Nixon and Spring Lake are single unitized operations with the sales of food and drink being merely adjuncts to the principal business of making recreational facilities available to the public. Section 201(b) (4) plainly contemplates at least two establishments, one of them covered by the Act, operating from the same general premises. See e. g. Pinkney v. Meloy, N.D.Fla., 241 F.Supp. 943. That situation does not exist here.

■ The second category set out in section 201(b) (2) consists of establishments "principally engaged" in the sale of food for consumption on the premises. Food sales are not the principal business of the establishments here involved, and the second category does not cover them. Cf. Newman v. Piggie Park Enterprises Inc., D.C.S.C., 256 F.Supp. 941.[4]

■ The third category, section 201 (b) (3), includes certain specifically described places of exhibition or entertainment and also "any other place. of exhibition or entertainment." It is clear that neither Lake Nixon nor Spring Lake is a motion picture house, concert hall, theatre, sports arena, or stadium. Hence, if either establishment is covered by the third category it must be on the theory that it falls within the catch-all phrase above quoted.

Determination of the scope of the catch-all phrase calls for an application of the Rule of *ejusdem generis*. Robertson v. Johnston, E.D.La., 249 F.Supp. 618, 622. In that case it was pointed out that "place of entertainment" is not synonymous with "place of enjoyment." And in addition this Court will point out that "entertainment" and "recreation" are not synonymous or interchangeable terms.

The statutory phrase "other place of exhibition or entertainment" must refer to establishments similar to those expressly mentioned. When one considers the exhibitions and entertainment offered by motion picture houses, theatres, concert halls, sports arenas, and stadiums, it is clear at once that basically patrons of such establishments are edified, entertained, thrilled, or amused in their capacity of spectators or listeners; their physical participation in what is being offered to them is either nonexistent or minimal; their role is fundamentally passive.

The difference in what is offered by the establishments named in section 201 (b) (3) and what is offered at Lake Nixon and Spring Lake is obvious. The latter establishments do not offer "entertainment" in the sense in which the Court is convinced that Congress used the word; what they offer primarily are facilities for recreation whereby their patrons can enjoy and amuse themselves.

■ In adopting section 201(b) (3) Congress must have been aware that "entertainment" and "recreation" are not synonymous or co-extensive, and had Congress intended to provide coverage with respect to a "place of recreation," it could have said so easily. The Court thinks that it is quite significant that neither the category in question nor any other category mentioned in section 201 (b) makes any mention of swimming pools, or parks, or recreational areas, or recreational facilities. And the Court

4. In using the term "food sales" the Court includes sales of both food and soft drinks. That sales of drinks would not be considered as sales of "food" is indicated by Cueva v. Sdrales, 10 Cir., 344

F.2d 1019; Robertson v. Johnston, E.D. La., 249 F.Supp. 618; Tyson v. Cazes, E.D.La., 238 F.Supp. 937, rev'd on other grounds, 5 Cir., 363 F.2d 742.

**420**

concludes that establishments like Lake Nixon and Spring Lake do not fall within section 201(b) (3) or any other category appearing in that section as it is presently drawn.

In coming to this conclusion the Court has not overlooked the dancing which has gone on at both establishments or the diving exhibitions and fireworks display at Spring Lake. Those exhibitions and that display were isolated events which took place in 1965, which have not been repeated, and which Mr. Culberson says will not be repeated. They were insignificant anyway, and it appears that the diving, which was done by life savers employed by Spring Lake, was not so much for the purpose of entertaining patrons as to demonstrate to them the competency of the life saving personnel.

As to the dancing, there are two things to be said: first, the dances held at Spring Lake play no significant part in the operations of that establishment, and the part played by the dances held regularly at Lake Nixon would seem to play a minor role in the Lake Nixon operation. Second, and more basically, it seems to the Court that dancing, whether to "live music" or to records played on a juke box, falls more within the concept of "recreation" than within the concept of "entertainment."

But, even if it be conceded to plaintiffs that the challenged establishments are "places of entertainment," the Court cannot find that under the law their operations affect interstate commerce. Certainly, the racial discrimination which the defendants have practiced has not been supported by the State of Arkansas or any of its political subdivisions.

Referring to section 201(c), the criterion which it establishes for the determination of whether a place of exhibition or entertainment "affects commerce" is

whether the establishment in question customarily presents films, performances, athletic teams, exhibitions or other sources of entertainment *which move in commerce.*" (Emphasis supplied.)

The emphasized words are not without significance when read in comparison with the statutory criterion for determining whether the operations of an eating establishment affect interstate commerce. With regard to such an establishment it is sufficient if it has served or offered to serve interstate travelers or if a substantial portion of the food which it serves *has moved* in interstate commerce. There is a distinct difference between a person or thing which *moves* in interstate commerce and a person or thing which simply *has moved* in interstate commerce.

As indicated, there is no evidence here and no reason to believe that the local musicians who play for the dances at Lake Nixon and Spring Lake have ever moved as musicians in interstate commerce or that they are now doing so. Nor do the juke boxes, the records and other recreational apparatus, such as boats, utilized at the respective establishments "move" in interstate commerce, although it is true that the juke boxes, some of their records, and part of the other recreational equipment and apparatus were brought into Arkansas from without the State.

The Court's approach to and its solution of the problem presented by these cases find full support in the opinion of Judge West in Miller v. Amusement Enterprises, Inc., E.D.La., 259 F.Supp. 523, a case involving a privately owned amusement park in Baton Rouge, Louisiana.[5]

From what has been said it follows that a decree will be entered dismissing the complaints in the respective cases.

5. That case was decided on September 13, 1966, and the opinion was published on December 12 of that year after the instant cases were tried.