397 F.2d 96
 Samuel E. NESMITH, Appellant,
v.
YOUNG MEN'S CHRISTIAN ASSOCIATION OF RALEIGH, N. C., and C. Lynn Brown, President of Executive Committee of Young Men's Christian Association of Raleigh, N. C., Inc., Appellees.
 No. 11931.
 United States Court of Appeals Fourth Circuit.
 Argued March 4, 1968.
 Decided June 7, 1968.
 
 Michael Meltsner, New York City, (Conrad O. Pearson, Durham, N. C., Samuel S. Mitchell, Romallus O. Murphy, Raleigh, N.C., J. LeVonne Chambers, Charlotte, N.C., and Jack Greenberg, New York City, on brief) for appellant.
 James K. Dorsett, Jr., Raleigh, N.C., (Henry A. Mitchell, Jr., and Smith, Leach, Anderson & Dorsett, Raleigh, N. C., on brief) for appellees.
 Before SOBELOFF and BOREMAN, Circuit Judges, and RUSSELL, District Judge.
 SOBELOFF, Circuit Judge:
 
 
 1
 The issue presented by this appeal is whether the health and athletic facilities of the Young Men's Christian Association of Raleigh, Inc., are covered by Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a et seq., which prohibits racial discrimination in places of public accommodation. That the lodging and eating operations of the Association are subject to the Act is uncontested.
 
 
 2
 Plaintiff, a 29-year old Negro Methodist minister, sought and was denied admission to the Men's Athletic Club of the Raleigh YMCA. Significantly, the only way an adult male can become a "member of the Y" is to be accepted as a member of the health or athletic club. Barring an applicant from membership in the health or athletic club not only denies him access to the sports facilities but also deprives him of all the incidents of YMCA membership. Upon being rejected as "insincere," plaintiff prosecuted this class suit on behalf of himself and others similarly situated, seeking an injunction against the racially discriminatory policies of the Raleigh YMCA.
 
 
 3
 Coverage under the Act seems manifest from the first two paragraphs of the statute. Section (a) requires that "All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages and accommodations of any place of public accommodation." (Emphasis added.) Section (b) (1) classifies any establishment which provides lodging to transient guests as a place of public accommodation, subject to a narrowly-drawn exception not pertinent here.[1] It is undisputed that the Raleigh YMCA provides lodging for as many as 120 transient guests and operates as well a coffee shop, civic meeting rooms and a chapel, which are, in the word of the YMCA, "for the use and benefit of the general public of Raleigh."[2] It is equally undisputed that neither the plaintiff nor any other Negro is permitted to use the showers, steam rooms, exercise devices, basketball courts and swimming pool which are facilities of the same YMCA which provides rooms for transient guests.
 
 
 4
 The YMCA contends, and the District Court found, that the athletic and health facilities are separate and distinct from the sleeping accommodations which are available to all and the adjoining coffee shop which stands ready to serve to any member of the public food that has moved in interstate commerce. The alleged separateness stems from the fact that the segregated athletic and health facilities are located twenty-five to fifty feet from the lodging area in a connected building, which shares a single heating unit, common utilities and a unitary telephone service with the building that houses the transient guests.
 
 
 5
 As the District Court for the Northern District of Georgia aptly observed, since places of public accommodation differ markedly in their operations, "the factual determination from which the Court must decide that it [a public place] either is or is not within the class described in the Act must be made on the circumstances of each case." Willis v. Pickrick Restaurant, 231 F. Supp. 396, 399 (N.D.Ga.1964). With constant awareness that the "essential purpose of the Act as reflected by both its language and history was to remove discrimination in places of public accommodation * * * with respect to all of the services rendered and operated within its physical confines * * *," Pinkney v. Meloy, 241 F.Supp. 943, 947 (N.D. Fla.1965),[3] we must examine the particular circumstances here to determine whether the Raleigh YMCA is a single establishment wholly covered by the Act by virtue of its admittedly public accommodations or whether the health and athletic facilities are indeed separate from the covered portions.
 
 
 6
 The building complex under review was begun as a single unit in 1958 on two adjacent lots which were bought simultaneously by the YMCA. Planned at the same time and financed from a common fund, including non-member contributions, the two adjoining buildings were completed and opened to their patrons in 1960. Since that time both structures have been under the general supervision of one authority, the Building & Equipment Committee. The Community Building, twice as large as the sister Athletic Building, contains bedrooms, a coffee shop, public lounges, television viewing areas, a chapel and meeting rooms for classes and discussions. The Athletic Building, to which access may be gained either from the Community Building or from the street, houses the exercise facilities, swimming pool, gymnasium, lockers and showers. A shed-like breezeway permits people to go from one structure to the other without being exposed to the weather.
 
 
 7
 Administratively and economically, the Raleigh YMCA is operated as a completely integrated entity. Pursuant to a single constitution, there is one executive secretary who, together with his delegated staff, administers both buildings and all of the activities therein contained. One general budget commingles all funds and assigns appropriations for every operation in both buildings, and deficits in one area may be overcome by profits accrued in the other. In 1965, the year plaintiff sought admission, bedroom rentals totalled $95,395.44; coffee shop revenues were $106,069.73; and clubroom rentals aggregated $14,377.43. Expenses in the Community Building from which these revenues were derived amounted to $180,167.59, leaving a surplus of nearly $36,000. On the other hand, activities in the Athletic Building yielded only $135,683.42 against operating costs of $218,659.58. The deficit was made up by using the excess from the Community Building plus a substantial contribution from the United Fund. All of this led to the District Court's unimpeachable finding of fact that "the general administrative and financial operations of the defendant association are conducted as one unified operation." Despite its finding of this objective fact, the court went on to make the subjective finding that the activities in the two buildings are "regarded as separate and distinct operations." In precisely what manner, by whom and for what purposes they are so "regarded" is spelled out neither in the court's opinion nor in any portion of the recorded evidence. We are therefore unable to accept this unsubstantiated finding upon which so much of the District Court's opinion depends.
 
 
 8
 In its advertisements soliciting memberships, the YMCA indiscriminately blends the activities of both buildings. Thus, in the same circular, men are invited to participate in such "adult special interest courses" as skin and scuba diving, judo, chess, bridge and fine arts. The first two, of course, are conducted in the athletic building while the latter three take place in the Community Building.[4] Similarly, women are invited to enroll in "scuba diving, bridge and dancing classes." No distinction is made in this offer to the public between the several enumerated activities, whether held in one building or the other. The same brochure, in that part which is aimed at attracting young boys, speak of "special religious and social programs," the former presumably to be held in the Community Building's chapel and the latter in the social areas of either the Community Building or the Athletic Building. Obviously, and most importantly, the activities in both buildings are inextricably intertwined[5] in the successful promotion of the YMCA's avowed objective, "the building of Christian character in our community's youth." (Emphasis added.) Providing decent rooming and wholesome food is neither more nor less essential in achieving this aim than teaching good sportsmanship and athletic proficiency. Like the buildings in which they are housed, the various operations of the Y serve to complement each other in an effort to attain the common goal.
 
 
 9
 In light of the physical, administrative, financial and conceptual integration of all of the facilities of the Raleigh YMCA, we are constrained to hold that within the meaning and intent of the Civil Rights Act the entire operation is a single establishment. And since it is an establishment which in important part provides lodging for transient guests, it is covered by the Act and may not lawfully discriminate on racial grounds in purveying any of its facilities or accommodations.
 
 
 10
 No issue has been raised in the District Court or before us as to whether the swimming pool, gymnasium and exercise activities come under section 201(b) (3) of the Act which prohibits discrimination in "any motion picture house, theatre, concert hall, sports arena, stadium, or other place of exhibition or entertainment." (Emphasis added.) We do not adjudicate this but we note the Fifth Circuit's en banc statement in a case involving a violation of section (b) (3):
 
 
 11
 "* * * to allow an amusement park such as Fun Fair to open its doors to all and invite the patronage of the public generally and then permit it to exclude Negroes under the facts presented by this record would violate the clear purpose and intent of the quoted sections of the Civil Rights Act of 1964. One of the purposes of that legislation was to eliminate the inconvenience, unfairness and humiliation of racial discrimination." (Emphasis added.) Miller v. Amusement Enterprises, Inc., 394 F.2d 342 (4/23/68).
 
 
 12
 This language is no less apt in the instant case.
 
 
 13
 Section (b) (4) of the Civil Rights Act, upon which the defendant relies heavily, is not applicable in this case. Clearly envisioning a case having two wholly distinct "establishments," that section provides:
 
 
 14
 "(b) Each of the following establishments * * * is a place of public accommodation * * *
 
 
 15
 (4) any establishment (A) (i) which is physically located within the premises of any establishment otherwise covered by this subsection, or (ii) within the premises of which is physically located any such covered establishment and (B) which holds itself out as serving patrons of such covered establishment."
 
 
 16
 A typical example of the situation at which this section is aimed is a barbershop operated within a hotel but under separate management from the lodging establishment. In such a case, if the barbershop represented that it would service guests of the hotel, the barbershop would become a "covered establishment." We have seen that the instant case involves one completely integrated establishment; thus there is no need to find any "holding out," which the defendant contends is lacking in this case. We point out, however, that even if § (b) (4) were pertinent, the health and athletic facilities would still be covered. As we shall delineate in greater detail below, the health and athletic facilities are in practice fully available to virtually any white applicant. If any white person may upon payment of a fee utilize these contested facilities, it follows then that any white lodger in the YMCA may do likewise. In this respect, there undeniably is a holding out to some patrons of the admittedly covered establishment, thereby satisfying the requirement of § (b) (4). In other words, the holding out, though not addressed in terms to the lodgers, runs clearly to the white patrons of the covered establishment. Again we note however that § (b) (4), with its emphasis on situations where there are two distinct establishments, does not apply in this "single establishment" case.
 
 
 17
 The YMCA, assuming arguendo that its health and athletic facilities are covered by the Act, claims exemption by virtue of § 2000a(e), which provides that the duty to serve all persons equally "shall not apply to a private club or other establishment not in fact open to the public." The burden of proof rested upon the YMCA to substantiate its claim to private club status, see Kyles v. Paul, 263 F.Supp. 412, 416 (E.D.Ark. 1967). Upon investigation, its position is manifestly untenable.
 
 
 18
 It is true that the YMCA's health and athletic clubs have, and for many years before the passage of the 1964 Act have had, some of the trappings of a private club. There is an application blank for membership, a membership committee, a regularly recorded list of members, and substantial annual dues. In addition, membership cards are allegedly prerequisite to admittance to the Athletic Building. Examination, however, must go beyond these mere superficialities. As Senator Humphrey made clear in the floor debate over this exemption, "The test as to whether a private club is really a private club or whether it is an establishment not open to the public is a factual one * * *." 110 Cong.Rec. 13697 (1964). This thought was echoed by Senator Long, author of the provision, who said of it, "Its purpose is to make clear that the test of whether a private club * * * is exempt from Title II, relates to whether it is in fact * * * an establishment not open to the public." Ibid. (Emphasis added.) The fact here is that the Raleigh YMCA is a public establishment, open to any white individual who can afford the yearly membership rates which range from $30 to $100.
 
 
 19
 At the end of 1965, the YMCA had 2,696 members, approximately half of whom had joined in that year. Each November new members are sought in one concentrated public membership drive which is led not only by old members but also by civic-minded non-members. Neither the constitution nor any stated or unstated policy of the YMCA sets any limits on the size of the membership. Application is available to "any person of good moral character who subscribes to the Association's purposes." Although there is a membership committee, it is admitted that there are no prescribed or regularly used qualifications for membership and no particular rules or regulations governing the committee's activities. This fact is borne out by the application blank itself, which asks only for the name, address and church affiliation of the prospective member. Apparently no interview is held. Of 1300 applications from August, 1965, to September, 1966, only five were rejected. Over 99% of the white applicants were accepted; 100% of the Negroes were rejected. No white has ever been rejected as "insincere" as the Negro plaintiff was.[6]
 
 
 20
 In determining whether an establishment is in fact a private club, there is no single test. A number of variables must be examined in the light of the Act's clear purpose of protecting only "the genuine privacy of private clubs * * * whose membership is genuinely selective * * *." 110 Cong. Rec. 13697 (1964) (remarks of Senator Humphrey). The first factor is the size of the organization and the open-ended character of its membership rolls. Most private clubs have limited membership, Bradshaw v. Whigman, 11 Race Rel.L.Rep. 934 (S.D. Fla.1966), and easily articulated general admission standards. In Re Holiday Sands, 9 Race Rel.L.Rep. 2025 (Ohio Civ.Rights Comm.1964). As one commentator observed, "Where there is a large membership or a policy of admission without any kind of investigation of the applicant, the logical conclusion is that membership is not selective * * *." Note, 62 N.W.U.L.Rev. 244, 247, n. 21 (1967). See also Note, 54 Geo.L.Rev. 915, 939 (1966). The YMCA, with no limits on its membership and with no standards for admissibility, is simply too obviously unselective in its membership policies to be adjudicated a private club.
 
 
 21
 In addition to this palpable non-selectivity, there is the undisputed fact that the health and athletic clubs hold no general meetings for their members. "Hardly can a club be a private association where the members do not meet together." 45 N.C.L.Rev. 498, 505 (1967). Lastly, and most revealingly, we note that more than 20 per cent of the operating funds for the allegedly private Athletic Building is provided by the United Fund. At oral argument, counsel for the YMCA candidly acknowledged that he knew of no other "private club" which is similarly financed by public contributions. Nor are we aware of any private club for which members are solicited by non-members.
 
 
 22
 Thus, despite a large and unlimited membership, the lack of any genuine selectivity (other than along racial lines), and the admitted substantial reliance upon public support and public financing through the United Fund, the Raleigh YMCA protests that it is a private club. The simplest and most compelling answer is that "serving or offering to serve all the members of the white population within a defined geographical area is certainly inconsistent with the nature of a truly private club." Note, 62 N.W.U.L.Rev. 244, 246 (1967). The "private club" defense in this case is patently unsupportable. The fact that the modus vivendi of the organization has been the same in past years and is not a recently devised subterfuge to circumvent the 1964 Act is irrelevant. As Senator Long stated, the force of the exemption "does not relate to whatever purpose or animus the organizers may have had in mind when they brought the organization into existence." 110 Cong. Rec. 13697 (1964).
 
 
 23
 We hold, then, that no part of the Raleigh YMCA is a private club but that the entire entity is a single establishment covered in all respects by Title II of the Civil Rights Act of 1964. Accordingly, we reverse the District Court and remand the case for the issuance of an injunction requiring the defendant to comply fully with the statute in the operation of its health and athletic facilites as well as in the sleeping and eating accommodations. Moreover, in accord with the Supreme Court's recent decision in Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968), the District Court will assess costs and reasonable attorneys' fees against the defendant.
 
 
 24
 Reversed and remanded with instructions.
 
 
 
 Notes:
 
 
 [1]
 "42 U.S.C. § 2000a(b): Each of the following establishments which serves the public is a place of public accommodation within the meaning of this subchapter if its operations affect commerce, or if discrimination or segregation by it is supported by State action:
 (1) any inn, hotel, motel, or other establishment which provides lodging to transient guests, other than an establishment located within a building which contains not more than five rooms for rent or hire and which is actually occupied by the proprietor of such establishment as his residence; * * *."
 
 
 [2]
 In response to an interrogatory requesting a brief description of its goals and purposes, the YMCA stated: "This defendant attempts to aid in the development of a wholesome society. It provides the facilities of a modern and well-equipped Community Building for the use and benefit of the general public of Raleigh. * * * This defendant encourages use of such facilities in an atmosphere which will develop wholesome and Christian personality."
 
 
 [3]
 See also the statement of Mr. Justice Clark in Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 250, 85 S.Ct. 348, 354, 13 L.Ed.2d 258 (1964): "The Senate Commerce Committee made it quite clear that the fundamental object of Title II was to vindicate `the deprivation of personal dignity that surely accompanies denials of equal access to public establishments.'"
 
 
 [4]
 The following colloquy in the deposition of YMCA business secretary R. Norman Williams may be instructive:
 "Q. Now, do you collect funds from the special classes you have at the Y? * * *
 A. Yes. That is a small income but there is some of that from adult programs.
 Q. Now, in which building would say a special interest course, where would that take place?
 A. That would be in the community building.
 Q. Who would be eligible to become a member of this special interest course?
 A. Anytone who wanted to pay the fee for it. It is open to the public.
 Q. As is the skin and scuba diving course, who would be an eligible person for that?
 A. I believe, anyone who paid the fee.
 Q. Where would that take place?
 A. No, skin and scuba diving, that would be for members of the clubs only. In the pool mostly."
 
 
 [5]
 Ironically, this intermeshing is perhaps best illustrated by the fact that the membership subcommittee which rejected plaintiff's application for the Athletic Club met in the Community Building
 
 
 [6]
 We note in passing that no inquiry was made in the case of the plaintiff or any other applicant as to his sincerity or any other intangible quality
 
 
 BOREMAN, Circuit Judge (dissenting):
 
 25
 I am not persuaded to accept the reasoning adopted and the result favored by the majority. We are not to be guided by considerations of a desirable social policy since such considerations are not relevant here. The plaintiff's case must stand or fall upon what Congress has provided in Title II, section 201 et seq., of the Civil Rights Act of 1964 (42 U.S. C. Subchapter II, § 2000a et seq.), and a reasonable construction of the language of the Act convinces me that it was not intended to cover the health and athletic membership clubs of the Raleigh YMCA, a nonprofit corporation. In fact, a contrary intention is readily discernible.
 
 
 26
 The district court found this to be a case of first impression and I have been unable to find a case on all fours with this one. It is obviously a case intended as a "test," as to the plaintiff and others, of the applicability of the provisions of the Act under the unusual facts and circumstances here existing.
 
 
 27
 The clear purpose of Title II of the Civil Rights Act of 1964 was to eliminate discrimination on the grounds of "race, color, religion, or national origin" in specified places of public accommodation. Here it is plaintiff's theory, accepted by my brothers, that the health and athletic club facilities of the YMCA and the building in which they are housed are, within the meaning of the Act, a place of "public accommodation," and that the rejection of plaintiff's application for membership was discriminatory because of his race. My first and principal point of disagreement is with the conclusion that the Raleigh YMCA is a single establishment wholly covered by the Act and that the health and athletic facilities are not separate from the facilities and services provided in the Community Building. The District Court stated in Nesmith v. Young Men's Christian Ass'n of Raleigh, N.C., Inc., 273 F.Supp. 502, 506 (D.C.E.D.N. C., 1967):
 
 
 28
 "* * *. In the first place, it cannot be said that the health and athletic club facilities are physically located within the premises of the Community Building, the covered establishment. The facilities are located in separate buildings and constitute separate and distinct operations. The facts that the two structures are physically connected by a covered walkway, some of the operations of the two facilities are carried on by the same person, and both buildings are served by the same heating unit and other utilities, are of little consequence."
 
 
 29
 The Community Building fronts on Hillsboro Street in the City of Raleigh, North Carolina, and the main entrance is at the front of the building. The health and athletic clubs and facilities are housed and operated in a much smaller separate building which fronts on Jackson Street with the main entrance at the front where a "Members Only" sign is conspicuously placed. No one is admitted to the athletic club building without a membership card, issued to him upon payment of the not insubstantial annual membership fee and upon approval by the membership committee, and this has been true since the two buildings here involved were constructed in 1960, four years prior to the passage of the Act. Several cases have reached the courts where a change in operations after passage of the Act was found to be only a sham and obviously adopted for the sole purpose of escaping the effect of the provisions of the Act. This is not such a case.
 
 
 30
 As the majority recognizes, the particular circumstances here must be examined to determine whether the Raleigh YMCA is a "single establishment" wholly covered by the Act, or whether the health and athletic facilities are indeed separate from the "covered portions."
 
 
 31
 Some of the facilities and services provided in the Community Building are made available to local residents and transients without discrimination on account of race, but not all such facilities are open to all segments of the general public. In fact, occupancy of sleeping accommodations is restricted to males although the coffee shop and other areas are open to both males and females.
 
 
 32
 Admittedly, however, the Community Building is a "covered establishment" under the Act but, in determining whether the health and athletic clubs' building is a "place of public accommodation," we look to the specific provisions of the Act. Subsection (b) of section 2000a of Title II provides the definition of a place of public accommodation.[1]
 
 
 33
 There is no contention made in this case that discrimination or segregation is "supported by State action" nor is there any contention that the activities or operations conducted in the separate health and athletic building, standing alone, affect commerce. Clearly, paragraphs (1), (2), and (3) of section 2000a(b) have no application to the health and athletic activities or the separate building in which they are conducted unless such activities are covered by the provisions of paragraph (b) (4).
 
 
 34
 Subsection (b) (4) (A) (i) refers to any establishment which is physically located within the premises of any establishment otherwise covered by subsection (b); and (4) (A) (ii) refers to any establishment within the premises of which is physically located any such covered establishment. I disagree with my brothers with respect to their interpretation of these provisions in light of the facts. I agree with the district court that the athletic building is not physically located within the premises of the covered Community Building nor is the Community Building physically located within the premises of the athletic building.
 
 
 35
 However, assuming arguendo for the purposes of subsection (b) that a broad and liberal interpretation of these provisions as to physical location is appropriate and desirable in the circumstances, we are met with the further provision which refers back to both (i) and (ii) of (4) (A), which reads as follows:
 
 
 36
 "* * * and (B) which holds itself out as serving patrons of such covered establishment." (Emphasis added.)
 
 
 37
 In short, any "establishment" under either (i) or (ii) is a place of public accommodation only if provision (B) is applicable. There is no evidence of any such holding out by the separate health and athletic clubs as serving patrons, as such, of the facilities and services available in the Community Building. All the evidence is most emphatically to the contrary. The word "and" before "(B)" is a significant and obviously deliberate limitation. There is no evidence in conflict with the lower court's findings that the athletic clubs are not physically located within the Community Building premises and do not, and never have, held themselves out as serving patrons of the Community Building. Plaintiff objects to the "restrictive construction" of the Act by the district court but, more appropriately, such objection or criticism should be directed to the limitations contained in the Act itself which Congress saw fit to impose.
 
 
 38
 In Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964), the plaintiff sought a declaratory judgment and an injunction, attacking the constitutionality of portions of Title II of the Civil Rights Act of 1964, 78 Stat. 241, 243; 42 U.S.C., Subchapter II, § 2000a et seq. From Justice Clark's opinion it would appear that the real purpose of the public accommodations portion of the Civil Rights Act of 1964 was not to reach such organizations as the separate health and athletic membership clubs operated by the YMCA, but was to provide for nondiscriminatory use of public hotels, motels, restaurants and certain other establishments that were customarily used by the traveling public so that there could be a free movement in commerce without discrimination as to race or color. At pages 252 and 253, 85 S.Ct. at page 355, the Court stated:
 
 
 39
 "While the Act as adopted carried no congressional findings the record of its passage through each house is replete with evidence of the burdens that discrimination by race or color places upon interstate commerce. * * * This testimony [presented in hearings before certain congressional committees] included the fact that our people have become increasingly mobile with millions of people of all races traveling from State to State; that Negroes in particular have been the subject of discrimination in transient accommodations, having to travel great distances to secure the same; that often they have been unable to obtain accommodations and have had to call upon friends to put them up overnight * * *; and that these conditions had become so acute as to require the listing of available lodging for Negroes in a special guidebook which was itself `dramatic testimony to the difficulties' Negroes encounter in travel. * * *. This testimony indicated a qualitative as well as quantitative effect on interstate travel by Negroes. The former was the obvious impairment of the Negro traveler's pleasure and convenience that resulted when he continually was uncertain of finding lodging. As for the latter, there was evidence that this uncertainty stemming from racial discrimination had the effect of discouraging travel on the part of a substantial portion of the Negro community."
 
 
 40
 The same theme — the basis of congressional action by virtue of the power of Congress over interstate commerce — found in the Atlanta Motel case appears in the companion case of Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964).
 
 
 41
 To hold that the Civil Rights Act of 1964 applies to the distinctly separate health and athletic membership clubs operated by the YMCA would, in my opinion, be stretching the language of section 2000a to an unwarranted and unintended degree. There is nothing to indicate that Congress sought such a result. I would affirm the judgment below.
 
 
 
 Notes:
 
 
 [1]
 (b) Each of the following establishments which serves the public is a place of public accommodation within the meaning of this subchapter if its operations affect commerce, or if discrimination or segregation by it is supported by State action:
 (1) any inn, hotel, motel, or other establishment which provides lodging to transient guests, other than an estabment located within a building which contains not more than five rooms for rent or hire and which is actually occupied by the proprietor of such establishment as his residence;
 (2) any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food for consumption on the premises, including, but not limited to, any such facility located on the premises of any retail establishment; or any gasoline station;
 (3) any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment; and
 (4) any establishment (A) (i) which is physically located within the premises of any establishment otherwise covered by this subsection, or (ii) within the premises of which is physically located any such covered establishment, and (B) which holds itself out as serving patrons of such covered establishment.