**Mrs. Patricia B. MILLER, Individually, and on Behalf of her minor children, Denise and Daniel Miller, Appellant,**

v.

**AMUSEMENT ENTERPRISES, INC., d/b/a Fun Fair Park, Appellee.**

**No. 24259.**

United States Court of Appeals Fifth Circuit.

Sept. 6, 1967.

Johnnie A. Jones, Baton Rouge, La., Norman C. Amaker, Henry M. Aronson, New York City, for appellant.

W. P. Wray, Jr., Baton Rouge, La., for appellee.

Before RIVES and DYER, Circuit Judges, and JOHNSON, District Judge.

RIVES, Circuit Judge:

Solely because of their race or color, Mrs. Miller and her two minor children were refused the services and facilities of Fun Fair Park, a privately-owned amusement center which serves the public. The facts and circumstances are adequately stated in the opinion of the district court, reported in 259 F.Supp. at 523. The controlling question is whether Fun Fair Park is "a place of public accommodation" as defined in Section 201 of the Civil Rights Act of 1964:

"(a) All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin.

"(b) Each of the following establishments which serves the public is a place of public accommodation within the meaning of this subchapter if its operations affect commerce, or if discrimination or segregation by it is supported by State action:

"(1) any inn, hotel, motel, or other establishment which provides lodging to transient guests, other than an establishment located within a building which contains not more than five rooms for rent or hire and which is actually occupied by the proprietor of such establishment as his residence;

"(2) any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food for consumption on the premises, including, but not limited to, any such facility located on the premises of any retail establishment; or any gasoline station;

"(3) any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment; and

"(4) any establishment (A) (i) which is physically located within the premises of any establishment otherwise covered by this subsection, or (ii) within the premises of which is physically located any such cov-

ered establishment, and (B) which holds itself out as serving patrons of such covered establishment.

"(c) The operations of an establishment affect commerce within the meaning of this subchapter if (1) it is one of the establishments described in paragraph (1) of subsection (b) of this section; (2) in the case of an establishment described in paragraph (2) of subsection (b) of this section, it serves or offers to serve interstate travelers or a substantial portion of the food which it serves, or gasoline or other products which it sells, has moved in commerce; (3) in the case of an establishment described in paragraph (3) of subsection (b) of this section, it customarily presents films, performances, athletic teams, exhibitions, or other sources of entertainment which move in commerce; and (4) in the case of an establishment described in paragraph (4) of subsection (b) of this section, it is physically located within the premises of, or there is physically located within its premises, an establishment the operations of which affect commerce within the meaning of this subsection. For purposes of this section, 'commerce' means travel, trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia and any State, or between any foreign country or any territory or possession and any State or the District of Columbia, or between points in the same State but through any other State or the District of Columbia or a foreign country.

"(d) Discrimination or segregation by an establishment is supported by State action within the meaning of this subchapter if such discrimination or segregation (1) is carried on under color of any law, statute, ordinance, or regulation; or (2) is carried on under color of any custom or usage required or enforced by officials of the

State or political subdivision thereof; or (3) is required by action of the State or political subdivision thereof.

"(e) The provisions of this subchapter shall not apply to a private club or other establishment not in fact open to the public, except to the extent that the facilities of such establishment are made available to the customers or patrons of an establishment within the scope of subsection (b) of this section. Pub.L. 88–352, Title II, § 201, July 2, 1964, 78 Stat. 243." 42 U.S. C.A. § 2000a.

The claim is straitly narrowed by the following stipulation:

"It is * * * stipulated by and between counsel that the plaintiff herein is making no claim that the defendant, in the operation of the concession stands wherein refreshments are allegedly served on a discriminatory basis, is operating his facilities in violation of either Sec. 201(b) (2), Sec. 201(c) (2), Sec. 201(b) (4), or Sec. 201(c) (4) of the Civil Rights Act of 1964, the plaintiff's sole contention in this suit being that the defendant is operating his place of entertainment in violation of Sec. 201(b) (3) and Sec. 201(c) (3) of the Act. It was further stipulated that the reference in the stipulated facts to the operation of the concession stands is merely to show the total operation of the defendant's facility and not to allege or show a violation of Sec. 201(b) (2), 201(c) (2), 201(b) (4), or 201(c) (4) of the Civil Rights Act of 1964." [1]

There is no claim or evidence that the discrimination or segregation is supported by State action, nor is there any claim or evidence of a violation of Section 202 of the Act:

"All persons shall be entitled to be free, at any establishment or place, from discrimination or segregation of any kind on the ground of race, color, religion, or national origin, if such dis-

---

1. Compare Adams v. Fazzio Real Estate Co., E.D.La.1967, 268 F.Supp. 630, now on appeal to this Court, Docket No.

24825; Evans v. Laurel Links, Inc., E.D. Va.1966, 261 F.Supp. 474; Kyles v. Paul, E.D.Ark.1967, 263 F.Supp. 412.

crimination or segregation is or purports to be required by any law, statute, ordinance, regulation, rule or order of a State or any agency or political subdivision thereof. Pub.L. 88–352, Title II, § 202, July 2, 1964, 78 Stat. 244." 42 U.S.C.A. § 2000a–1.[2]

The inquiry is narrowed to the question of whether an amusement park which offers no exhibitions for the entertainment of spectators[3] is a "place of entertainment" as contemplated by Section 201(b) (3). The district court's opinion answered that question in the negative. That answer finds support in an earlier district court opinion, Robertson v. Johnston, E.D.La. 1966, 249 F. Supp. 618, rev'd on other grounds, 5 Cir. 1967, 376 F.2d 43, and is also supported by a more recent district court opinion, Kyles v. Paul, supra note 1. Apparently, this is the first appellate presentation of the question.

At the conclusion of the oral argument, this Court expressed "the opinion that the interests of justice require a complete and thorough search and analysis of the legislative history concerning 42 U.S.C.A. 2000a, b(3) and c(3)"; and with the consent of the parties requested "that the United States, acting through the Civil Rights Division of the Department of Justice, file with this Court * * * its brief setting forth the legislative history of these provisions to the extent that that history may be pertinent to the issues involved upon this appeal and according this Court the benefit of any views that may be pertinent thereto." We are grateful to the Civil Rights Division for its response, in which it sets forth at length the pertinent legislative history and expresses the view that it "is inconclusive on these issues." We believe that that response may be of so much help not only in the future consideration of this case, but also in future cases which present this important and comparatively novel question, that we are attaching it as an Exhibit to this opinion.

 We recognize that some parts of the legislative history may lend support to the appellant's position, but we think that those are greatly overbalanced by the parts we indicate by the italicized portions of the appendix. The parts of the legislative history so indicated clearly support the view that places of recreation, dance studios, bowling alleys, billiard parlors, skating rinks and amusement parks which offer no exhibitions for the entertainment of spectators are not places of entertainment as contemplated by Section 201(b) (3). For that reason and for the reasons so ably expressed by the learned district judge in reaching that conclusion, the judgment is

Affirmed.

## APPENDIX

### MEMORANDUM OF THE UNITED STATES

#### STATEMENT

The United States is filing this memorandum in response to the Court's request of June 13, 1967. We set forth below the legislative history of 42 U.S.C.A. 2000a, (b) (3), and (c) (3) insofar as it appears pertinent to the issues in this appeal. Our study of that history has convinced us that it is inconclusive on these issues.

#### LEGISLATIVE HISTORY

*I.* Presidential Proposal

On January 28, 1963, President Kennedy said in a message to Congress that:

No action is more contrary to the spirit of our democracy and Constitution—or more rightfully resented by a Negro citizen who seeks only equal treatment—than the barring of that citizen from restaurants, hotels, theaters, recreational areas and other public accomodations and facilities.

United States House of Representatives, Committee on the Judiciary, 88th Con-

---

2. Compare Robertson v. Johnston, 5 Cir. 1967, 376 F.2d 43.

3. Cf. Evans v. Laurel Links, Inc., supra note 1 (261 F.Supp. at 477).

gress, 1st Session, Hearings on Civil Rights, Part II, p. 1448.

In his civil rights message of June 19, 1963, the President said:

Events of recent weeks have again underlined how deeply our Negro citizens resent the injustice of being arbitrarily denied equal access to those facilities and accommodations which are otherwise open to the general public.

United States House of Representatives, Committee on the Judiciary, 88th Congress, 1st Session, Hearings on Civil Rights, Part II, p. 1447. To correct this injustice, the President emphasized that:

Federal action is needed now to secure the right of all citizens to the full enjoyment of all facilities which are open to the general public.

United States House of Representatives, Committee on the Judiciary, 88th Congress, 1st Session, Hearings on Civil Rights, Part II, p. 1448. Thus, the President continued:

For these reasons, I am today proposing, as part of the Civil Rights Act of 1963, a provision to guarantee all citizens equal access to the services and facilities of hotels, restaurants, places of amusement, and retail establishments.

United States House of Representatives, Committee on the Judiciary, 88th Congress, 1st Session, Hearings on Civil Rights, Part II, p. 1449.

On June 20, 1963, Representative Celler introduced the administration bill, H. R. 7152. In its original form, the "place of entertainment" provision of the bill read:

Any motion picture house, theater, sports arena, stadium, exhibition hall, or other public place of amusement[1] or entertainment which customarily presents motion pictures, performing groups, athletic teams, exhibitions, *or other sources of entertainment which move in interstate commerce.*

United States House of Representatives, Committee on the Judiciary, Hearings on Civil Rights, Part I, p. 652. In addition, H.R. 7152 originally included a provision covering

any other establishment where goods, services, facilities, privileges, advantages, or accommodations are held out to the public for sale, use, rent, or hire, if * * * a substantial portion of any goods held out to the public by any such place or establishment for sale, use, rent, or hire has moved in interstate commerce.

United States House of Representatives, Committee on the Judiciary, 88th Congress, 1st Session, Hearings on Civil Rights, Part I, p. 653. This provision was omitted from the Judiciary Committee's reported bill. House Report No. 914 on H.R. 7152, 88th Congress, 1st Session, Part I, p. 2–3.

*II.* The Bill in the House of Representatives

In Subcommittee No. 5 of the House Judiciary Committee, Title II was replaced by a "Committee Print" dated October 2, 1963, which broadened coverage to the full limits of constitutional power under the 14th Amendment by the addition of a catchall provision covering businesses operating under State licenses. See United States House of Representatives, Committee on the Judiciary, Hearings on H.R. 7152, Part IV, p. 2653, 2656. *This broad coverage was criticized by the Attorney General on October 15, 1963 in a statement before the full Committee.* The Attorney General first stated the need for Title II:

* * * [E]stablishments which serve the public generally, but which discriminate against Negroes, continue to be a constant irritant and inconvenience to large numbers of citizens.

United States House of Representatives, Committee on the Judiciary, Hearings

---

1. Changed to "exhibition" in Judiciary Committee's reported version. House Report on H.R. 7152, 88th Congress, 1st Session, Part I, p. 3, U.S. Congressional and Administrative News, p. 2355.

on H.R. 7152, Part IV, p. 2654–2655. He followed by defining its purposes:

The basic purposes of title II are to embody in legislative form a strong expression of the American people's disapproval of racial discrimination in places open to the general public and to eliminate the significant sources of this daily insult to millions of our fellow citizens. \* \* \* the principle upon which title II stands is a moral one and all forms of racial discrimination are equally objectionable.

Id. at 2655. We then discussed the coverage of Title II:

One can argue legitimately from this moral principle to the inclusion of all forms of business enterprise within the reach of the Constitution. *The administration proposal did not attempt to extend Federal law so far. The focus of title II was upon those businesses which, on the basis of our experience, posed the most troublesome problems of discrimination. It was our view that Congress could legitimately take into account the following:*

*First, the extent to which businesses potentially affected do in fact discriminate against Negro customers;*

*Second, the extent to which enforcement in key businesses would induce voluntary practices in others within the same community;*

*Third, the areas of coverage should be clear to both the proprietors and the public; and*

*Fourth, the utility and wisdom of promoting local solution to these problems and decreasing the need for Federal regulation.*

These criteria were employed in the bill submitted by the President and introduced by the chairman. *It was confined to those business establishments which on the basis of current experience have proved to be the most important sources of discrimination and, therefor, the focal point of most of the demonstrations.*

That bill specified hotels and motels, restaurants and lunch counters, retail stores and gasoline stations, movie houses, and similar places of public amusement. *The coverage was quite explicit. We did not include other establishments which were constitutionally within the reach of Federal regulations, either because they do not customarily discriminate or because we felt that—given a solution to the major problems—removal of these discriminatory practices could be voluntarily induced. We were reluctant to extend Federal power beyond those areas where it was clearly needed to meet existing problems.*

Id. at 2655–2656. In commenting further on the scope of Title II as contemplated by the administration, the Attorney General said:

*As far as title II is concerned, it is aimed at particular establishments, particular types of businesses where the problem has existed, where we need some remedies for these difficulties.*

United States House of Representatives, Committee on the Judiciary, 88th Congress, 1st Session, Hearings on H.R. 7152, Part IV, p. 2701.

The bill finally reported by the House Judiciary Committee contained the present § 201(b) (3) covering "any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment". United States House of Representatives Report No. 914 on H.R. 7152, 88th Congress, 1st Session, Part I, p. 3. In reporting the bill on November 20, 1963, the House Judiciary Committee said that enactment of Title II:

would make it possible to remove the daily affront and humiliation involved in discriminatory denials of access to facilities ostensibly open to the general public.

United States House of Representatives Report No. 914, 88th Congress, 1st Session, Part I, p. 18. Representative Kastenmeier filed separate views recommend-

ing passage of H.R. 7152 as reported, but stating:

> In title II, the bill reported by the full committee is deficient in that it guarantees equal access to only some public accommodations, as if racial equality were somehow divisible. Discrimination is prohibited in the reported version of H. R. 7152 in all hotels and lodginghouses (with a minor exception), eating places, and places of entertainment and spectator sports. At the same time, the bill would allow discrimination to continue in barber shops, beauty parlors, many other service establishments, retail stores, bowling alleys, and other places of recreation and participation sports, unless such places serve food. \* \* \* There may be constitutional limitations on what activities can be covered by Federal legislation, but the categories covered by title II of the reported bill are not based on constitutional limitations. In this respect the subcommittee bill, which would have covered virtually all places of public accommodation, to the limit of the Federal Government's power to legislate, was clearly a better bill, and would have avoided many of the anomalous situations presented by the reported bill.

United States House of Representatives Report No. 914, 88th Congress, 1st Session, Part I, p. 40–41 (1963).

The bill next went to the House Rules Committee where on January 9, 1964 Representative Cellar said that Title II:

> seeks to remove the daily affront and humiliation occasioned by discriminatory denials of access to facilities open to the general public. The mounting resentment to such discrimination has been responsible for numerous protests and demonstrations.

United States House of Representatives, Committee on Rules, 88th Congress, 2d Session, Hearings on H.R. 7152, p. 91. Congressman Cellar's statement also contains one of the few references that might be used in construing the interstate commerce requirement:

Title II of the bill prohibits discrimination on ground of race, color, or national origin in hotels, motels, theaters, places of amusement presenting entertainment which move [sic] in interstate commerce, and restaurants, luncheon counters and gasoline stations which sell food or goods which move in commerce or which serve interstate travelers.

United States House of Representatives, Committee on Rules, 88th Congress, 2d Session, Hearings on H.R. 7152, p. 92.

The bill then reached the floor, where the only statement which might be relevant here was made by Representative Lindsay. As to coverage of Title II, he said: "It is pinpointed, it is nonsweeping." 110 Cong.Rec. 1924.

The House passed the bill on February 10, 1964 with changes not pertinent here. 110 Cong.Rec. 2804–2805.

### III. The Bills in the Senate

Simultaneously with the introduction of H.R. 7152 in the House, S. 1731 and S. 1732 were introduced in the Senate. S. 1731 was the entire administration bill; it was referred to the Senate Judiciary Committee, which made no report on it. S. 1732 contained only the administration's public accommodations proposals. It was identical to the public accommodations provisions of H.R. 7152 as originally introduced; that is, it was based exclusively on the commerce power, and it had broader coverage than Title II as finally enacted by the House. S. 1732 was considered by the Senate Commerce Committee.

While these bills were in committee, Senator Humphrey on July 9, 1963 made the following statement on the floor of the Senate:

> Mr. President, I am sure my colleagues have read the recent newspaper articles on the demonstration which occurred at Gwynn Oak Amusement Park, outside of Baltimore, Md. If doubts existed prior to this weekend about the desirability of President Kennedy's pending proposal to secure equal access to public facilities, these

events surrounding the mass arrests at Gwynn Oak Amusement Park should have banished them.

The demonstrations and subsequent arrests * * * surely provided a graphic illustration of the fact that businessmen opening their doors for public business have a responsibility to serve all the public. * * *

* * * * * *

The owners of the Gwynn Oak Amusement Park do not claim to operate a private club. Their doors have been opened to the general public. Having made this decision, they have the clear obligation to serve all potential customers, assuming that accepted rules of decorum and behavior are maintained.

* * * * * *

* * * If ever there was proof of need of the President's program, it took place within 40 miles of the Nation's Capital. * * *

* * * * * *

In this particular instance, I am confident that merchandise and facilities used in the park were transported across State lines. Persons from all sections of the country, that is, white persons, are welcomed as customers. The impact of the park on interstate commerce cannot be doubted.

The spectacle of national church leaders being hauled off to jail in a paddy wagon demonstrates the absurdity of the present situation regarding equal access to public facilities in Maryland and the absurdity of the arguments of those who oppose title II of the President's omnibus civil rights bill. * * *

* * * * * *

In my opinion, the events of the past weekend only make more evident the urgent need for prompt congressional action on civil rights.

109 Cong.Rec. 12275–12277.

During the Senate Commerce Committee hearings on S. 1732, Senator Thurmond asked the Attorney General if places of "amusement or entertainment" would:

extend to teams or participants in athletic events as well as to spectators; thereby preventing the management of a privately owned stadium or sports arena from denying their facilities to colored athletic teams:

The following exchange took place:

*Mr. Kennedy: It would not cover the teams, in my judgment, Senator.*

*Senator Thurmond: In other words, it would not cover participants in athletic games?*

*Mr. Kennedy: That is correct.*

United States Senate, Committee on Commerce, 88th Congress, 1st Session, Hearings on S. 1732, Part 1, p. 107.

The Committee Report on this part of S. 1732 said:

There is no change from the bill as introduced. This is the second of three mutually exclusive groups of public establishments that are covered by the bill. This subsection would include all public places of amusement or entertainment which customarily present motion pictures, performing groups, athletic teams, exhibitions, or other sources of entertainment which move in interstate commerce. These public establishments would be within the provisions of the bill even though at any particular time the source of entertainment being provided had not moved in interstate commerce. It is sufficient if the establishment "customarily" presents entertainment that has moved in interstate commerce. If this test is met then the establishment would be subject to the bill at all times, even if current entertainment had not moved in interstate commerce.

United States Senate, Committee on Commerce, 88th Congress, 2d Session, Report No. 872 on S. 1732, p. 3.

While S. 1731 was pending before the Judiciary Committee, and S. 1732 was before the Commerce Committee, Senator Keating offered amendments to those bills to insure that the enumeration of public establishments in them "shall not

be construed to exclude the application of such subsection to any other public establishment not listed in such clause which is similar to such enumerated establishment." See 109 Cong.Rec. 13090–13091. These proposals seem to have no subsequent history.

On March 26, 1964, Senator Mansfield's motion that the Senate consider H.R. 7152 as received from the House without referring it to a committee was adopted. 110 Cong.Rec. 6415–6417. Senate debate on the merits of H.R. 7152 began with a comprehensive speech by Senator Humphrey on March 30, 1964. As to Title II, he said:

The grievances which most often have led to protest and demonstrations by Negro Americans are the segregation and discrimination they encounter in the commonly used and necessary places of public accommodation—hotels, motels, eating places, and places of entertainment. No amount of oratory and quibbling can obscure the personal hardships and insults which are produced by discriminatory practices in these places. * * * We must make certain that every door in our public places of amusement and culture is open to men of black skin as well as white. In sum, we must put an end to the shabby treatment of the Negro in public places which demeans him and debases the value of his American citizenship.

110 Cong.Rec. 6533. He pointed out, however, that:

*The reach of that title is much narrower than when the bill was first introduced. It is also narrower than S. 1732, the bill reported by the Senate Commerce Committee,* which covers the general run of retail establishments. * * * The deletion of the coverage of retail establishments generally is illustrative of the moderate nature of this bill and of its intent to deal only with the problems which urgently require solution.

110 Cong.Rec. 6533. See also 110 Cong. Rec. 6567. On the next page his remarks continued:

*Of course, there are discriminatory practices not reached by H.R. 7152, but it is to be expected and hoped that they will largely disappear as the result of voluntary action taken in the salutory atmosphere created by enactment of the bill.*

110 Cong.Rec. 6534.

Senator Magnuson was floor manager of Title II. On April 9, 1964 he discussed Title II in detail. As to the scope of its coverage, he said:

The types of establishments covered are clearly and explicitly described in the four numbered subparagraphs of section 201(b). An establishment should have little difficulty in determining whether it falls in one of these categories. * * * *Similarly, places of exhibition and entertainment may be expected to know whether customarily it [sic] presents sources of entertainment which move in commerce.*

110 Cong.Rec. 7405 (1964).

Most motion picture theaters customarily present films made in Hollywood or other out-of-State localities and obviously would be covered. Most legitimate theaters, concert halls, or sports arenas similarly present performers or athletes who move interstate, and such establishments likewise would be covered.

110 Cong.Rec. 7406. *He said that dance studios, bowling alleys, and billiard parlors would be exempt. 110 Cong.Rec. 7407.*

As to the interstate commerce requirement, he began by showing how discrimination in places of amusement might burden commerce:

Discriminatory practices in places of amusement and retail establishments often leads [sic] to the withholding of patronage by those affected, and in that way the normal demand for goods or entertainment is restricted. Other patrons, even though not themselves subject to discrimination, also avoid establishments employing such practices when picketing or boycotting occurs because of fear of possible violence.

110 Cong.Rec. 7398 (1964) (quoting from the findings of the Senate Commerce Committee).

Motion picture theaters which refuse to admit Negroes will obviously draw patrons from a narrower segment of the market than if they were open to patrons of all races. * * * Thus, the demand for films from out of state, and the royalties from such films, will be less. * * *

These principles are applicable not merely to motion picture theaters but to other establishments which receive supplies, equipment or goods through the channels of interstate commerce. If these establishments narrow their potential markets by artificially restricting their patrons to non-Negroes, the volume of sales and therefore, the volume of interstate purchases will be less.

110 Cong.Rec. 7402. He then dealt with the meaning of the phrase "customarily presents films, performances, athletic teams, exhibitions, or other sources of entertainment which move in commerce." He said:

A place of amusement or entertainment would not be covered merely because, on one or two occasions, it presents sources of entertainment which move in interstate commerce. By "customarily," section 201(c) (3) means more than occasionally. Some significant percentage of the performances occurring in an establishment must move in interstate commerce if it is to come within the purview of title II. But once it is within the purview of the title, the fact that a particular production presented there did not move in interstate commerce would not lift the requirement that the audience or spectators be unsegregated. Thus, a baseball stadium which is customarily used for games by teams traveling interstate is held to the nondiscrimination standard even on a day when local sandlot teams are playing there.

Furthermore, there is no requirement for the application of title II that the particular kind or class of entertainment provided at a given time must customarily move in interstate commerce. For example, a concert hall customarily presenting musical artists who move interstate must operate on a desegregated basis not only for their concerts but also for a special lecture series presented by local people.

110 Cong.Rec. 7406.

Senator Kuchel also discussed Title II:

The commerce clause test would apply if the enumerated establishment is related to the movement of persons or goods across state boundaries. Thus, * * * if the films, exhibitions, or athletic teams presented in a public place of amusement have moved in interstate commerce, then the establishment would be covered by title II.

110 Cong.Rec. 6557. He placed in the Congressional Record a memorandum prepared by the Republican membership of the House Committee on the Judiciary, which in describing the effect on interstate commerce of establishments enumerated in Title II said:

Theaters and other places of entertainment regularly present films or performers that move in interstate commerce.

110 Cong.Rec. 6566.

Senator Case, defending the constitutionality of Title II under the commerce clause, referred to a memorandum submitted by "twenty of the nation's outstanding lawyers":

The memorandum refers to restraints of trade on the manner of extent of the local exhibition of motion pictures. * * * All such activities as boxing matches and stage attractions, predicated on the commerce clause, have been subject to Federal legislation. *The memorandum states: 'The supporting theory is that the exhibitions, and those who take part in them, move from State to State and the particular*

*restraint would limit the freedom or the volume of interstate transactions.'* 110 Cong.Rec. 7258.

During the Senate debate, Senator Ervin offered amendment No. 795, which was rejected by a 66–22 vote. This amendment would have changed § 201(c) (3) to read:

> * * * customarily presents films, performances, athletic teams, exhibitions, or other sources of entertainment which move in commerce *and have not come to rest within a state.*

110 Cong.Rec. 13426, 13432 (daily ed. June 16, 1964) (emphasis added). Senator Ervin offered this, and three other amendments, to "make the tests of public accommodations in title II comply with the decisions of the courts upon the commerce clause of the Constitution." Id. at 13426. The debate following the vote indicates that both proponents and opponents of the bill contemplated that it would reach as far as the commerce clause would permit with respect to the minimum volume of commerce and the stage of the interstate journey. See Id. at 13433–13436.

H.R. 7152 passed the Senate, with amendments, on June 19, 1964. However, the sections herein involved remained intact. The conference bill was passed by both houses and became law on July 2, 1964.

> Respectfully submitted,
> JOHN DOAR,
> *Assistant Attorney General,*
> DAVID L. NORMAN,
> BRIAN K. LANDSBERG,
> *Attorneys,*
> *Department of Justice.*

JOHNSON, District Judge (dissenting).

The district court and this Court in its majority opinion have held that Fun Fair Amusement Park is not a place of "entainment" and is therefore not "a place of public accommodation" within the meaning of the Civil Rights Act of 1964. These holdings are based upon a finding that Congress did not intend an amusement park to be a place of "entertainment" within the meaning of § 201(b) (3), 42 U.S.C.A. § 2000a(b) (3). The intent of Congress on this point, as that intent may be determined from the legislative history concerning the sections in question, is obscure to say the least. After studying the briefs and hearing the arguments of the parties in the case now before this Court, it was determined that the legislative history as presented to the Court by the parties was so inadequate and inconclusive that a "thorough search and analysis of the legislative history concerning 42 U.S.C.A. 2000a, b(3) and c(3) was needed." Accordingly, it was ordered that the United States, acting through the Civil Rights Division of the Department of Justice, file with this Court its brief setting forth the legislative history of these provisions to the extent that that history might be pertinent to the issues involved upon this appeal and accord this Court the benefit of any views that might be pertinent thereto. Pursuant to that directive, the United States filed its memorandum setting forth the legislative history of these facts, and concluded, "Our study of that history has convinced us that it is inconclusive on these issues." Thus, it occurs to me that an interpretation of §§ 201(b) (3) and 201(c) (3), based upon an extremely inadequate legislative history as the majority of this Court now does, is contrary to the overriding purpose of Title II of the Civil Rights Act of 1964. This overriding purpose was made clear when on January 28, 1963, President Kennedy said in a message to Congress that:

> "No action is more contrary to the spirit of our democracy and Constitution—or more rightfully resented by a Negro citizen who seeks only equal treatment—than the barring of that citizen from restaurants, hotels, theaters, recreational areas and other public accommodations and facilities."

United States House of Representatives, Committee on the Judiciary, 88th

Congress, 1st Session, Hearings on Civil Rights, Part II, p. 1448.

Again, in his civil rights message on June 19, 1963, the President said:

"Events of recent weeks have again underlined how deeply our Negro citizens resent the injustice of being arbitrarily denied equal access to those facilities and accommodations which are otherwise open to the general public."

United States House of Representatives, Committee on the Judiciary, 88th Congress, 1st Session, Hearings on Civil Rights, Part II, p. 1447.

To correct this injustice, the President emphasized that:

"Federal action is needed now to secure the right of all citizens to the full enjoyment of all facilities which are open to the general public."

United States House of Representatives, Committee on the Judiciary, 88th Congress, 1st Session, Hearings on Civil Rights, Part II, p. 1448.

And, again, the President, in submitting to Congress that part of the Civil Rights Act here under scrutiny and in explaining his purpose in doing so, stated:

"For these reasons, I am today proposing, as part of the Civil Rights Act of 1963, a provision to guarantee all citizens equal access to the services and facilities of hotels, restaurants, places of amusement, and retail establishments."

United States House of Representatives, Committee on the Judiciary, 88th Congress, 1st Session, Hearings on Civil Rights, Part II, p. 1448.

The effect of the narrow construction as made both by the district court and the majority of this Court—this narrow construction being based upon an "inconclusive" legislative history—is to judicially determine and hold that an amusement park in Baton Rouge, Louisi-ana, located on Airline Highway, a main artery between Baton Rouge and New Orleans, Louisiana, operating eleven major amusement facilities, ten of which were manufactured outside the State of Louisiana, which advertised its facilities over the radio and television and solicited the business of the public generally, with no restriction as to race or interstate travel, can, with the sanction of the law, refuse service to Negroes solely because of their race or color.

Such a holding completely ignores a strong and, to me, conclusive history of Executive and Congressional general intent and purpose to the effect that the enactment of Title II:

"Would make it possible to remove the daily affront and humiliation involved in discriminatory denials of access to facilities ostensibly open to the general public." [1]

I respectfully dissent.

---

1. Statement made by the House Judiciary Committee on Title II in reporting the bill on November 20, 1963. U.S. House of Representatives Report No. 914, 88th Congress, 1st Session, Part I, p. 18.