394 F.2d 342
 Mrs. Patricia B. MILLER, Individually and on Behalf of her minor children, Denise and Daniel Miller, Appellant,
v.
AMUSEMENT ENTERPRISES, INC., d/b/a Fun Fair Park, Appellee.
 No. 24259.
 United States Court of Appeals Fifth Circuit.
 April 8, 1968.
 
 COPYRIGHT MATERIAL OMITTED John Doar, Stephen J. Pollak, Asst. Attys. Gen., David L. Norman, Brian K. Landsberg, Frank D. Allen, Attys., Dept. of Justice, Washington, D. C., amicus curiae.
 Johnnie A. Jones, Baton Rouge, La., Norman C. Amaker, Henry M. Aronson, Jack Greenberg, James M. Nabrit, III, Michael Meltsner, New York City, for appellant; William Bennett Turner, New York City, of counsel.
 Wray & Simmons, W. P. Wray, Jr., Baton Rouge, La., for appellee.
 Before BROWN, Chief Judge, and RIVES, TUTTLE, WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON and CLAYTON, Circuit Judges.*
 GEWIN, Circuit Judge:
 
 
 1
 A panel of this court rendered a decision in this cause on September 6, 1967 (No. 24259), 391 F.2d 86,[1] holding that an amusement park is not an establishment covered by the Civil Rights Act of 1964, § 201(b) (3) and (c) (3), 42 U.S.C. § 2000a(b) (3) and (c) (3). A petition for rehearing en banc was granted. After much careful and thoughtful consideration, we reverse.
 
 
 2
 Fun Fair Park, incorporated under Louisiana law as Amusement Enterprises, Inc., is a privately owned amusement park which ostensibly offers its facilities to the general public. The amusement park is located in Baton Rouge, Louisiana, approximately 150 yards from Airline Highway, which runs between Baton Rouge and New Orleans, Louisiana. The park covers about two and three-quarters acres of land in a business and residential area. Fun Fair operates eleven major mechanical rides for children, namely, the Train Ride, Roto-Whip, Ferris Wheel, Zoom Ride, Roller Coaster, Bumper Car Ride, Swinging Jim, Caterpillar Ride, Boat Ride, Track Turnpike, and Merry-go-round. In addition, it operates an ice skating rink during the months of November, December, January and February and maintains an ice skate rental service. Located on the premises is a small concession stand from which refreshments such as cold drinks, hot dogs, popcorn, cotton candy, snowcones, ice cream, assorted sandwiches and coffee may be purchased. Fun Fair's advertisements over radio and television solicit the business of the public generally with no expressed restriction or reservation as to race or interstate travel. However, the manager stated in his deposition that the facilities are only open to those of the public who are white, properly attired and who properly conduct themselves. The manager further stated that it is the policy of Fun Fair to exclude Negroes and that no change in policy is contemplated.
 
 
 3
 Mrs. Miller, in response to Fun Fair's advertisement that "Everybody come," took her two children, Daniel age 12 and Denise age 9, to the park to ice skate. At the skate rental counter she asked for skates for Denise, who has a fair or light complexion, and the attendant thinking the little girl was white, promptly handed Mrs. Miller a pair of skates. Daniel, dark-complexioned, who had been sent back to the Miller car for heavy socks, then joined his mother and sister. The rented skates were soon discovered to be too small and Mrs. Miller returned to the rental stand and placed the skates on the counter. In the meantime the attendant had discovered that the child was Negro and he had left the skate room to inform the manager of the situation. As the manager approached the counter, Mrs. Miller stated to him that the skates did not fit. The manager snatched the skates off the counter and announced to Mrs. Miller that Fun Fair did not "serve colored". The people standing in line waiting to rent skates began to giggle, and Denise, frightened and disappointed at not being allowed to skate, started crying. As Denise stood there crying others in line appeared to be amused. Mrs. Miller and her children quickly left the park.
 
 
 4
 Mrs. Miller, individually and on behalf of her minor children, Denise and Daniel Miller (appellants), brought this action in the United States District Court for the Eastern District of Louisiana pursuant to Title II of the Civil Rights Act of 1964, §§ 201(b) (3) and (c) (3), 42 U.S.C. §§ 2000a(b) (3) and (c) (3), to enjoin Amusement Enterprises, Inc., d/b/a Fun Fair Park (Fun Fair) from denying Negroes access to its amusement park. At the pre-trial conference it was stipulated by the parties that appellants were making no claim that Fun Fair was operating in violation of §§ 201(b) (2), (c) (2), (b) (4) or (c) (4), 42 U.S.C. §§ 2000a(b) (2), (c) (2), (b) (4) or (c) (4)[2] which prohibit discrimination in any establishment within which is located a facility engaged in serving or offering to serve food for consumption on the premises to interstate travelers or wherein a substantial portion of the food it serves has moved in commerce. We quote from the record:
 
 
 5
 "It is * * * stipulated by and between counsel that the plaintiff herein is making no claim that the defendant, in the operation of the concession stands wherein refreshments are allegedly served on a discriminatory basis, is operating his facilities in violation of either Sec. 201(b) (2), Sec. 201 (c) (2), Sec. 201(b) (4), or Sec. 201 (c) (4) of the Civil Rights Act of 1964, the plaintiff's sole contention in this suit being that the defendant is operating his place of entertainment in violation of Sec. 201(b) (3) and Sec. 201(c) (3) of the Act. It was further stipulated that the reference in the stipulated facts to the operation of the concession stands is merely to show the total operation of the defendant's facility and not to allege or show a violation of Sec. 201(b) (2), 201(c) (2), 201(b) (4), or 201 (c) (4) of the Civil Rights Act of 1964."
 
 
 6
 Subsequent to appellants' petition for rehearing in this case, the United States filed with this court a memorandum as amicus curiae on appellants' petition.[3] In its memorandum the Government urged that this court grant the motion for rehearing and vacate the judgment of the district court and remand the case to the court for an evidentiary hearing on the question of whether Fun Fair is covered by the nondiscrimination requirements of §§ 201(b) (2) and (b) (4). The Government's sole contention was that the stipulation quoted above, in effect, converted appellants' case into a hypothetical situation and thus presented to the court a hypothetical question not based on the facts involved in the litigation. The Government urged that the federal courts are without power to render advisory opinions or to resolve hypothetical questions.[4] Accordingly, the Government requested that the case be remanded to the district court for a determination of the issue of whether Fun Fair is covered by virtue of its operation of eating facilities.
 
 
 7
 Neither party has asked to be relieved of the stipulation. Appellants' answer to the Government's memorandum takes issue with the Government's assertion that the stipulation renders appellants' cause of action a mere hypothetical question and contends, primarily, that the Government's request is contrary to and does violence to Rule 16, Federal Rules of Civil Procedure.[5]
 
 
 8
 In its brief on rehearing the Government does not discuss its advisory opinion theory, mentioned above, but instead contends that the parties cannot, by a stipulation of law, remove from the district court the duty to test coverage under the facts presented and to apply to those facts each legal theory under which coverage might be found.[6] Further, the Government contends that it is not necessary to remand the case but submits that there is ample support in the record to justify a holding by this court that the Fun Fair Park is covered by § 201(b) (4).
 
 
 9
 We uphold the stipulation voluntarily agreed upon by the parties involved. The stipulation does not create a situation which does not in fact exist. The stipulation does not exclude any of the facts involved in this case, but, in effect, specifically reserves for consideration by the court, in particular, the facts pertaining to the concession stand operated by Fun Fair at its amusement park. The stipulation does no more than state that appellant has agreed not to present a claim under certain sections of the Civil Rights Act. Thus, the parties are not presenting to us a hypothetical situation, nor are we asked to render an advisory opinion because the facts in this case as found in the record make it abundantly clear that a "case or controversy" actually exists between adverse litigants. We, therefore, honor the stipulation. Associated Beverages Co. v. P. Ballantine & Sons, 287 F.2d 261 (5 Cir. 1961); Laird v. Air Carrier Engine Service, 263 F.2d 948 (5 Cir. 1959). However, we refrain from deciding the question, posed by the Government in its brief on rehearing, of whether the parties can, by stipulation, bind the court as to a theory of law thereby restricting the court in its application of the law to the facts presented. In view of our decision holding Fun Fair to be a covered establishment under §§ 201 (b) (3) and (c) (3) of the Act, it is not necessary for us to consider this issue.
 
 
 10
 Sections 201(a), (b) (3) and (c) (3) provide:
 
 
 11
 "(a) All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin.
 
 
 12
 "(b) Each of the following establishments which serves the public is a place of public accommodation within the meaning of this subchapter if its operations affect commerce, or if discrimination or segregation by it is supported by State action:
 
 
 13
 * * * * * *
 
 
 14
 "(3) any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment;
 
 
 15
 * * * * * *
 
 
 16
 "(c) The operations of an establishment affect commerce within the meaning of this subchapter if * * * (3) in the case of an establishment described in paragraph (3) of subsection (b) of this section, it customarily presents films, performances, athletic teams, exhibitions, or other sources of entertainment which move in commerce."
 
 
 17
 There is no claim or evidence that the discrimination complained of is supported by State action. Therefore our inquiry is narrowed to the question of whether Fun Fair is a "place of * * * entertainment" which "customarily presents * * * entertainment which move[s] in commerce."
 
 
 18
 The district court held that Fun Fair is not a place of entertainment as described in § 201(b) (3) and does not affect commerce as that term is specifically defined in § 201(c) (3) of the Act. The court was of the opinion that the term entertainment referred to in § 201(b) (3) is limited by the language of the section and by the application of the old and accepted rule of statutory construction known as ejusdem generis to such entertainment which is exhibitive and not participative. The court further stated that even if it were to find an amusement park to be a place of public accommodation under § 201(b) (3), it still could not be held to affect commerce under § 201(c) (3). In so concluding the court again applied the ejusdem generis rule in defining the term entertainment as used in § 201(c) (3) and, additionally, placed particular emphasis on the phrase "which move in commerce" concluding that the mechanical rides at Fun Fair which are permanently affixed do not "move".
 
 
 19
 On appeal to this court the Government was requested to file with the court a brief setting forth the legislative history of the applicable provisions of the Civil Rights Act to the extent that such history might be pertinent to the issues involved.[7] After an examination of the legislative history, the court rendered its decision affirming by a vote of 2 to 1 the judgment of the district court.[8] While the court recognized that some parts of the legislative history may lend support to appellants' claim, it was of the opinion that the history read as a whole clearly and amply supported the view that amusement parks are not places of entertainment as contemplated by § 201(b) (3).
 
 
 20
 We are unable to agree with those concepts which would prefer, or those which would demand, that the Civil Rights Act be narrowly construed, i. e. the establishments referred to in § 201 (b) (3) must be places of entertainment which present exhibitions for spectators and that such exhibitions must move in interstate commerce. However, while not necessary to our decision, as will be seen by a further reading of this opinion, we find that Fun Fair is covered by the literal terms of the Act. Although it may be that the types of exhibition establishments listed in § 201(b) (3) are those which most commonly come to mind, no one would dispute the proposition that such list is not complete or exhaustive. Therefore, any establishment which presents a performance for the amusement or interest of a viewing public would be included. In our view Fun Fair is such an establishment. The amusement park presents a performance of small children riding on various mechanical "kiddie" rides plus a performance of ice skating. It is obvious to us that many of the people who assemble at the park come there to be entertained by watching others, particularly their own children, participate in the activities available. In fact Mrs. Miller's presence at the park was to see her children perform on ice.[9] While the record does not explicitly and clearly show this to be a fact, aside from Mrs. Miller's statement, we as Judges may take judicial knowledge of the common ordinary fact that human beings are "people watchers" and derive much enjoyment from this pastime.[10] Moreover, we can not ignore the logical conclusion that a number of the patron-performers of the Fun Fair amusement park, an essential part of Fun Fair's exhibition, move in commerce. Again, while the record does not categorically establish where the patron-performers have originated and where they will or might travel next for other performances of a like nature, we lay emphasis on the fact that the record does show that the park is located on a major highway and does not geographically restrict its radio and television advertisements.[11] While some may take a dim view at our reaching conclusions with apparently scant record facts to support them, we quote from Mr. Justice Field in his opinion in the case of Ho Ah Kow v. Nunan, 12 Fed.Cas. No. 6,546, pp. 252, 255 (C.C.D. Cal.1879):
 
 
 21
 "Besides, we cannot shut our eyes to matters of public notoriety and general cognizance. When we take our seats on the bench we are not struck with blindness, and forbidden to know as judges what we see as men; * * *"
 
 
 22
 Our reading, study and careful consideration of the Civil Rights Act and its legislative history compels us to conclude that the general intent and overriding purpose of the act was to end discrimination in certain facilities open to the general public. We agree with the view of the Government, expressed in its memorandum to this court, that the legislative history of §§ 201(a), (b) (3) and (c) (3) is "inconclusive" and the opinion of the dissenting judge in this case that such legislative history is "obscure" on the precise question of whether recreational facilities such as those under consideration were intended by Congress to be covered by the Act. Even the majority opinion of the original panel which heard this case recognized the fact that such history could support differing interpretations of the statute. In view of the "inconclusive nature" of the legislative history and in light of the overriding purpose of the Act, we hold that Fun Fair Park is a place of public accommodation under §§ 201(b) (3) and (c) (3) of the Civil Rights Act.
 
 
 23
 We do not read §§ 201(b) (3) and (c) (3) with narrowed eye but with open minds attuned to the clear and strong purpose of the Act, namely, to secure for all citizens the full enjoyment of facilities described in the Act which are open to the general public. That Title II of the Civil Rights Act is to be liberally construed and broadly read we find to be well established.[12] Though we give to the Act a liberal interpretation, we are aware that the Act was not designed to cover all establishments. "Congress * * * exclude[d] some establishments from the Act either for reasons of policy or because it believed its powers to regulate and protect interstate commerce did not extend so far." Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 273, 85 S.Ct. 348, 366, 13 L.Ed.2d 258, 277 (1964). However, in view of the facts and circumstances present in the instant case we are unable to conclude that recreational facilities such as those operated by Fun Fair are one of the excluded establishments.
 
 
 24
 We find that the phrase "place of entertainment" as used in § 201 (b) (3) includes both establishments which present shows, performances and exhibitions to a passive audience and those establishments which provide recreational or other activities for the amusement or enjoyment of its patrons. Although we recognize that ejusdem generis is an old and accepted rule of statutory construction, we do not believe that it compels us to accord words and phrases embodied in the statute a definition or interpretation different from their common and ordinary meaning; or that the rule requires us to interpret the statute in such a narrow fashion as to defeat what we conceive to be its obvious and dominating general purpose. In Borough of Hanover v. Criswell, 205 Pa.Super. 65, 66 (1965), 208 A.2d 39, the Pennsylvania court dealt with the principle of ejusdem generis and reached a conclusion similar to the one we have reached here.[13] Also, Supreme Court decisions clearly show that the rule of ejusdem generis does not prevail when the result of its use would be contrary to the obvious purpose of the statute in question. United States v. Alpers, 338 U.S. 680, 70 S.Ct. 352, 94 L. Ed. 457 (1950); S. E. C. v. C. J. Joiner Leasing Corp., 320 U.S. 344, 88 L.Ed. 88 (1943); United States v. American Trucking Association, 310 U.S. 534, 60 S. Ct. 1059, 84 L.Ed. 1345. Further, we think, had Congress meant to confine § 201(b) (3) to only those establishments dealing in exhibitions it would have concluded such section with the phrase "and other places of exhibition" rather than ending the section with the language "or other place of exhibition or entertainment." (emphasis added)
 
 
 25
 Webster's Third New International Dictionary defines entertainment as the act of diverting, amusing, or causing someone's time to pass agreeably; amusement. Synonyms for entertainment as found in various sources[14] include the following: amusement, bodily enjoyment, fun, recreation, diversion, relaxation, sport, pleasure, play, merriment, festivity, celebration and revelry. Various state courts which have dealt with the meaning of the word entertainment have given the word similar definitions. See Cheney v. Tolliver (1962) 234 Ark. 973, 356 S.W.2d 636, and Young v. Board of Trustees, etc. (1931) 90 Mont. 576, 4 P.2d 725.[15] Fun Fair Park with its amusement rides, ice skating rink and concession stand is obviously a place of enjoyment, fun and recreation, and thus is a place of entertainment.
 
 
 26
 We also conclude that the operations and activities conducted and sponsored by Fun Fair affect commerce within the internment of the Act. To conclude otherwise would be to ignore those very operations and activities. Fun Fair is located on a major artery of both intrastate and interstate transportation; it advertises over radio and television stations; its advertisements solicit the business of the public generally with no restriction as to interstate travel; ten of its eleven mechanical rides admittedly were purchased from sources outside Louisiana; and although the items sold in the concession stand are listed in the record as having been purchased from businesses within the State, the record does not show whether the products sold by Fun Fair actually originated in Louisiana. The emphasis placed on the term "move" as used in § 201(c) (3) by the district court in the instant case and by the district court in Kyles v. Paul, supra, is misplaced. Such reasoning is like pulling a straw from a haystack and then judicially declaring that the entire stack has collapsed. Obviously in doing so the court would be ignoring reality. The use of the present tense, move, was not meant to exclude the word's other verb tenses, moving, moved, or has, had or have moved. As stated in Haynes v. United States, 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923, "We can not derive so much from so little." The "draftsman's choice of tense" should not control our decision.[16] We quote from a Senate Report giving a section by-section analysis of Title II which makes reference to what constitutes an effect on commerce within the meaning of § 201(c) (3):
 
 
 27
 "This subsection would include all public places of amusement or entertainment which customarily present motion pictures, performing groups, athletic teams, exhibitions, or other sources of entertainment which move in interstate commerce. These public establishments would be within the provisions of the bill even though at any particular time the source of entertainment being provided had not moved in interstate commerce. It is sufficient if the establishment `customarily' presents entertainment that has moved in interstate commerce. If this test is met then the establishment would be subject to the bill at all times, even if current entertainment had not moved in interstate commerce." (Emphasis added) 2 U.S.Code Cong. & Ad.News 2357 (1964)
 
 
 28
 Additionally, in Twitty v. Vogue Theatre Corp., 242 F.Supp. 281 (M.D.Fla.1965) the defendant movie theater contended that its establishment did not affect commerce within the meaning of § 201(c) (3) because the films it presented had come to rest in Florida and therefore did not move in commerce. It submitted that even though the films were produced outside Florida, they had been shipped to a Florida corporation for distribution within the State, which corporation had then forwarded the films to defendant. This contention was rejected by the court. Although the court recognized that the movement of the films between Florida corporations located within the state was purely intrastate and not movement in interstate commerce, the court stated, "* * * but the Act does not restrict the time for determining the nature of the movement of the film * * *." Consequently, considering all of the facts, circumstances and factors which we have discussed brings us to the firm conclusion that the operations and activities conducted by Fun Fair come within that category of activities which affect commerce as that term is defined in § 201(c) (3).
 
 
 29
 Moreover, the facts clearly demonstrate that Fun Fair had numerous direct and indirect contacts with interstate commerce. The authority to regulate purely local activities operating within a single state has been held to be vested in the Congress if such activities burden the flow of commerce among the states. As Justice Black stated in his separate opinion in the Atlanta Motel case, supra, and in Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290, the Supreme Court has long recognized "[t]hat Congress could not fully carry out its responsibility to protect interstate commerce were its Constitutional power to regulate that commerce to be strictly limited to prescribing the rules for controlling the things actually moving in such commerce or the contracts, transactions, and other activities, immediately concerning them." (Emphasis added) He went on to conclude:
 
 
 30
 "And since the Shreveport Case this Court has steadfastly followed, and indeed, has emphasized time and time again, that Congress has ample power to protect interstate commerce from activities adversely and injuriously affecting it, which but for this adverse effect on interstate commerce would be beyond the power of Congress to regulate."
 
 
 31
 The Civil Rights Act was enacted with a spirit of justice and equality in order to remove racial discrimination from certain facilities which are open to the general public. On January 28, 1963, President Kennedy said in a message to Congress that:
 
 
 32
 "No action is more contrary to the spirit of our democracy and Constitution — or more rightfully resented by a Negro citizen who seeks only equal treatment — than the barring of that citizen from restaurants, hotels, theaters, recreational areas and other public accommodations and facilities."[17]
 
 
 33
 We do no more, today, than abide by this spirit embodied in law. We do no injustice to the language employed to reduce this spirit to writing. In fact to do otherwise would be an injustice, and would be to pay homage to that same inequality which the laws of our land, the Congress in enacting them, the courts in interpreting them, and the executive branch in its enforcement efforts have strived to eradicate.
 
 
 34
 Finally, to allow an amusement park such as Fun Fair to open its doors to all and invite the patronage of the public generally and then permit it to exclude Negroes under the facts presented by this record would violate the clear purpose and intent of the quoted sections of the Civil Rights Act of 1964. One of the purposes of that legislation was to eliminate the inconvenience, unfairness and humiliation of racial discrimination. This case demonstrates the evils of such discriminatory practices especially when imposed upon a child of tender years during the formative period of her life, which practices, no doubt, generate permanent attitudes which become evident and active later. The venom of hate and prejudice should not be generated and cultivated at any time, especially during the early years of childhood. Once such attitudes have originated and are then fed and nurtured to maturity, they become permanent and explosive. We refuse to register our acceptance of the conduct here involved. To do so would shock our conscience and disturb our mind.
 
 
 35
 We are not only dealing with the language of the statute, but we must look as well to the logic of Congress and the broad national policy which was evidenced by its enactment. Our system does not favor mechanical jurisprudence; it seeks to find the purpose and spirit of a statute and the intention of its makers. Holy Trinity Church v. United States, 143 U.S. 457, 459, 12 S.Ct. 511, 36 L.Ed. 226, 228; National Woodwork Manufacturers Asso. v. NLRB, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357, 364.
 
 
 36
 For the various and several reasons heretofore discussed, we hold Fun Fair Park to be an establishment covered by §§ 201(b) (3) and (c) (3) of the Civil Rights Act. The judgment of the district court is, therefore, reversed.
 
 
 37
 Judgment reversed.
 
 
 
 Notes:
 
 
 *
 This is one of six cases submitted to the Court En Banc in Houston, Texas, January 10-11, 1968. The other cases are:
 No. 23841 — Palmer v. Thompson, 391 F.2d 324.
 No. 23125 — Steele v. Taft.
 No. 24314 — Allen v. Johnson, 391 F. 2d 527 & 391 F.2d 528.**
 No. 23813 — Luna v. Beto, 391 F.2d 329.
 No. 23963 — United States v. Cocke.
 
 
 **
 One of these cases deals with the merits of the case and the other deals with the competency of a Senior Circuit Judge to sit as a member of the Court upon reargument en banc
 
 
 [1]
 The panel was composed of Rives and Dyer, Circuit Judges, and Johnson, District Judge
 
 
 [2]
 These sections read as follows:
 Section 201(b) (2): "any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food for consumption on the premises * * *"
 Section 201(b) (4): "any establishment * * * within the premises of which is physically located any such covered establishment, and (B) which holds itself out as serving patrons of such covered establishment."
 Section 201(c) (2): "in the case of an establishment described in paragraph (2) of subsection (b) of this section, it serves or offers to serve interstate travelers or a substantial portion of the food which it serves * * * has moved in commerce."
 Section 201(c) (4): "in the case of an establishment described in paragraph (4) of subsection (b) of this section, there is physically located within its premises, an establishment the operation of which affect commerce within the meaning of this subsection."
 
 
 [3]
 At the time this memorandum was filed, there had been no order of this court formally designating the United States as amicus curiae. After the rehearing petition was granted, the Clerk, at our direction, invited the Government to appear and argue as amicus curiae on rehearing
 
 
 [4]
 Alabama State Federation of Labor, Local Union No. 103, United Brotherhood of Carpenters and Joiners of America v. McAdory, 325 U.S. 450, 65 S.Ct. 1384, 89 L.Ed. 1724 (1945); Muskrat v. United States, 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246 (1911)
 
 
 [5]
 Rule 16. Pre-Trial Procedure; Formulating Issues, provides, in part:
 "The court shall make an order which recites the action taken at the conference, the amendments allowed to the pleadings, and the agreements made by the parties as to any of the matters considered, and which limits the issues for trial to those not disposed of by admissions or agreements of counsel; and such order when entered controls the subsequent course of the action, unless modified at the trial to prevent manifest injustice."
 
 
 [6]
 See Estate of Sanford v. Commissioner of Internal Revenue, 308 U.S. 39, 60 S.Ct. 51, 84 L.Ed. 20 (1939); Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933); Crabb v. Commissioner of Internal Revenue, 121 F.2d 1015 (5 Cir. 1941)
 
 
 [7]
 The Government's brief is attached as an Exhibit to the court's opinion. Miller v. Amusement Enterprises, Inc., 391 F.2d 86 (5 Cir. 1967)
 
 
 [8]
 In its opinion this court stated that the conclusion that an amusement park is not a place of entertainment as contemplated by § 201(b) (3) is supported by two district court opinions, Robertson v. Johnston, 249 F.Supp. 618 (E.D.La.1966) rev'd. on other grounds, 376 F.2d 43 (5 Cir. 1967), and Kyles v. Paul, 263 F. Supp. 412 (E.D.Ark.1967). The approach taken by the district courts in the cited cases to the problem of what is a place of entertainment is essentially the same as that of the district court in the instant case. In Robertson the court stated, "[t]hus `place of entertainment' is not to be construed to mean `place of enjoyment', but rather must be limited at least to `place where performances are presented.'" 249 F.Supp. 618, 622. Similarly, the court in Kyles stated "that `entertainment' and `recreation' are not synonymous or interchangeable terms." 263 F.Supp. 412, 419
 
 
 [9]
 In Mrs. Miller's deposition she stated:
 "Yes, my little boy particularly was interested in showing off — showing me how well he could skate, too."
 
 
 [10]
 The following is from the record:
 "How many people would you say were present?
 "Well, I can't say exactly. There were people skating; there were people sitting in the seats; there were people standing waiting to be served."
 
 
 [11]
 In the television advertisements pictures of persons were shown skating. The following is from the record:
 "You had seen the advertisement on television, you say?
 "Yes, I had.
 "And it said come to Fun Fair Park?
 "Yes.
 "And it showed pictures of persons skating, didn't it?
 "They did, that's right.
 "Had you seen that on several occasions before you went there?
 "Yes, my little boy particularly was interested in showing off — showing me how well he could skate, too.
 "He was aware of it by virtue of the television?
 "Yes.
 "And so were you?
 "Yes.
 "I have no further questions."
 
 
 [12]
 See Hamm v. City of Rock Hill, 379 U.S. 306, 85 S.Ct. 384, 13 L.Ed.2d 300 (1964); State of Alabama v. United States, 304 F.2d 583 (5 Cir. 1962), aff'd. 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed. 2d 112. Though State of Alabama v. United States involves the Civil Rights Act of 1957, it does demonstrate the liberal view of the court
 
 
 [13]
 "Since the ordinance lists a number of specific forms of entertainment, defendants argue that the rule of ejusdem generis requires the exclusion of bowling. They then say that since all of the enumerated types of entertainment are of thespectator type as opposed to the type in which there is a participation, admissions to the former type only may be taxed under this ordinance. Such a strict construction would then render meaningless the phrase `engaging in' in the definition of `Admission' in the ordinance. This would violate the rule stated in Fidler v. Zoning Board of Adjustment, 408 Pa. 260, 267, 182 A.2d 692, 695, 97 A.L.R.2d 697, that `An ordinance like a statute must be construed, if possible to give effect to all of its provisions'. Also, "`The doctrine of ejusdem generis is but a rule of construction to aid in giving effect to the legislative intent, where there is uncertainty, and does not warrant the court in subverting or defeating the legislative will by confining the operation of a statute within narrower limits than intended by the law-makers. If, on consideration of the context and whole law upon the subject, and the purposes sought to be effected, it is apparent that the legislature intended the general words to go beyond the class specially designated, the rule does not apply.'" Commonwealth of Pennsylvania v. Randall, 183 Pa.Super. 603, 614, 133 A.2d 276, 281. We think it is apparent here that it was not the intention of the legislative body of the borough to restrict the application of this tax to admissions to spectator events. Entertainment is synonymous with diversion, recreation, pastime or sport. Webster's New International Dictionary, 2nd Edition. Bowling certainly then is a form of entertainment and therefore the charge made for the privilege of engaging in bowling is subject to the tax." (Emphasis added) 208 A.2d at p. 40.
 
 
 [14]
 Rodale, The Synonym Finder, 355 (1961); Roget's International Thesaurus, 569 (3rd ed. 1965)
 
 
 [15]
 The court inCheney stated:
 "The words `entertainment and Amusement' are synonymous, meaning:
 "1. That which engages the attention of agreeably or to occupy pleasurably.
 "Reading the Act as a whole the only reasonable conclusion the court can arrive at is this:
 "1. When the Act refers to entertainment and amusement facilities, it is considering a place where admission, dues and fees are paid for one to enter and attend. Having been granted this privilege the customer may then have access and the use of the facilities therein made available to him." At 639.
 In the Young decision the court stated: "`Entertainment' is defined, in part, as `that which serves for amusement,' and among the definitions of `amusement' is found `a pleasurable occupation of the senses, or that which furnishes it, as dancing, sports or music,' Webster's Dictionary. `Recreational activities,' within the meaning of the California law making schoolhouses civic centers, includes dancing. McClure v. Board of Education, 38 Cal.App. 500, 176 P. 711. A public dance, is therefore, a `public entertainment.' Commonwealth v. Quinn, 164 Mass. 11, 40 N.E. 1043." At 726.
 
 
 [16]
 InHaynes the court considered a somewhat similar argument with respect to the tense of the verb involved. We quote from the opinion:
 "The United States finds support for its construction of § 5851 chiefly in the section's use of the past tense: the act stated to be unlawful is `to possess any firearm which has not been registered as required by section 5841.' (Emphasis added.) It is contended that we may infer from this choice of tense that the failure to register must necessarily precede the accused's acquisition of possession. We cannot derive so much from so little. We perceive no more in the draftsman's choice of tense than the obvious fact that the failure to register must precede the moment at which the accused is charge; we find nothing which confines the clause's application to failures to register which have occurred before a present possessor received the firearm. It follows that the phrase fastened upon by the United States is, at the least, equally consistent with the construction advanced by petitioner."
 
 
 [17]
 United States House of Representatives, Committee on the Judiciary, 88th Congress, 1st Session, Hearings on Civil Rights, Part II, p. 1448
 We deem it appropriate to quote from a Presidential message to Congress with respect to legislation of great national concern. In Hamm v. City of Rock Hill, 379 U.S. 306, 315, 85 S.Ct. 384, 391, 13 L.Ed. 2d 300, 307, the Supreme Court stated:
 "As we have said, Congress, as well as the two Presidents who recommended the legislation, clearly intended to eradicate an unhappy chapter in our history."
 
 
 
 38
 RIVES, Circuit Judge, with whom Circuit Judges DYER and SIMPSON join (dissenting):
 
 
 39
 The judicial function is to determine not what the law should be, but what Congress, after hearings, conflict, compromise and change, finally enacted into law. That decision should be influenced neither by the appealing facts of this particular case nor by other factual situations in which the Congress may have had reason to believe that forced association in participant amusements might arouse antagonism or conflict, for the same statute must apply to the broad spectrum of cases which includes both extremes. The law which Congress intended to enact seems to me to be carefully and correctly stated in the able opinion of the district court which finds ample support in the legislative history documented in the appendix to this Court's opinion on original hearing. Being convinced that the judgment of the district court should be affirmed, I respectfully dissent.
 
 DISSENTING OPINION
 CLAYTON, Circuit Judge:
 
 40
 I dissent, not for the purpose of saying that the majority has reached an undesirable result, since that is not the question. The problem, as I see it, is one of law, not emotion, nor sociology, nor even philosophy. I recognize, as I must, that the facts which started this case on its journey to this court have a strong appeal to our sympathies — mistreatment of a small child, too young to know, or even care whether there is any real difference between a place for the entertainment of spectators only and a place for the entertainment of spectators and participants also. There may well be no such difference. But on the facts here, when viewed objectively, Congress made a difference which we have no right to disregard.
 
 
 41
 From the bills as introduced in both houses to the law as passed, legislative metamorphosis, which is normal with respect to all proposed legislation of a controversial nature, in this instance, as it has in others, may have resulted in a law less sweeping, less inclusive than many may have hoped. However, courts should take statutes as written, not as proposed nor as they might have been.
 
 
 42
 I agree with the fine objective opinion of Judge Rives, who wrote for the majority on original hearing. I also agree with the conclusions reached by the district court as reported in 259 F.Supp. 523 under the same style as the case here. Amusement parks, such as the one here, which offer no exhibitions for the entertainment of spectators are not places of entertainment as contemplated by Section 201(b) (3) of the Civil Rights Act of 1964.
 
 
 43
 I would affirm the judgment of the district court.
 
 COLEMAN, Circuit Judge:
 
 44
 Judge Clayton has exactly stated the views I entertain with reference to this case. I therefore join in his dissent.